Ralph LIGHTFOOT et al., Plaintiffs,

v.

**Daniel WALKER et al., Defendants.**

Civ. Nos. 73–238E, 78–2095.

United States District Court,
S. D. Illinois.

Feb. 19, 1980.

As Amended March 18, 1980.

Harvey Grossman, Land of Lincoln Legal Assistance Foundation, Inc., East St. Louis, Ill., Pat Flynn, Legal Services, Greenville, S.C., for plaintiffs.

Thomas Crooks, John Prusik, Asst. Attys. Gen., Victor Yipp, Ill. Dept. of Corrections, Chicago, Ill., for defendants.

## ORDER

FOREMAN, Chief Judge:

This is a civil rights action, brought under 42 U.S.C. § 1983, for the benefit of all prisoners at the Menard Correctional Center in Menard, Illinois (hereinafter referred to as Menard). Jurisdiction is predicated upon 28 U.S.C. § 1343(3), 1343(4) and 2201 et seq. The Court also invoked its pendent jurisdiction on October 18, 1976, to hear claims concerning inadequate health care, in violation of the Constitution, laws and regulations of the State of Illinois. The plaintiff class are seeking declaratory and injunctive relief, to stop state prison officials from maintaining an inadequate health care system for the prisoners at Menard.

This claim was originally filed on October 2, 1973, on behalf of thirty-eight (38) named black prisoners confined to segregation at the prison since May 1, 1973. One of the conditions challenged in this original complaint was the inadequacy of health care provided in segregation. A temporary restraining order entered by consent of the parties on December 4, 1973, provided, in part, for regular exercise and proper health care.

On July 14, 1975, in a first amended complaint, the plaintiffs expanded their proposed class to include all inmates in segregation. This group, certified as a class on

March 5, 1976, claimed violations of both federal constitutional and state law in a number of areas of institutional life, including a claim that a systematic denial of adequate health care services existed at Menard. Upon plaintiffs' motion, the Court appointed a panel of impartial medical experts pursuant to Rule 706 of the Federal Rules of Evidence.[1] The basic function and duties of that panel were stated as follows:

The medical panel shall assist the Court in determining questions of essential medical care as required by the United States Constitution and good medical practice as required by the Illinois Department of Corrections Administrative Regulations. The panel shall organize, direct and conduct a comprehensive health services survey to determine the adequacy and propriety of health care services presently being provided to the plaintiff class by the defendants.[2]

The Court was informed by letter on February 27, 1976, that the three physician appointees, Dr. Richard Della Penna, Dr. Lambert King and Dr. Ronald Shansky, were found acceptable by defendants.

On October 18, 1976, the Court, *sua sponte*, ordered a separate trial on the claim of denials of essential medical care as alleged in paragraphs 43–45 of the First Amended Complaint. The Court's medical panel filed its first report on November 18, 1976, and stated its conclusion that there is a systematic denial of acceptable medical care to the residents of the entire institution, not solely to the then existing plaintiff class of the prisoners in the segregation unit.

In light of the Medical Panel's finding that health care deficiencies were affecting the general population, as well as segregation, and there being no objection from the defendants, the Court on December 23, 1976, granted plaintiffs' motion to expand the plaintiff class to all inmates incarcerated at the institution for purposes of declaratory and injunctive relief as to those issues involving federal constitutional and pendent state claims of denials of medical care as stated in paragraphs 43 through 45 of the First Amended Complaint.

A non-jury trial of the health care issues for purposes of declaratory and injunctive relief commenced August 29, 1977, and continued for thirty-one (31) days of trial ending on November 17, 1977. During the trial, the Court's medical panel reinspected the institution pursuant to the request of defendants (Defendants' Motion for a Reinspection mailed for filing on June 22, 1977) and submitted their second request, "Report of Medical Panel Concerning Reinspection of Menard Correctional Center on September 20, 1977."

Plaintiffs called three experts and introduced 223 exhibits, while defendants called six experts and introduced 89 exhibits. Two members of the Court's panel of medical experts testified, and the panel's two reports were introduced into evidence.

The following is a brief summary of the qualifications of the Court's panel:

1. Lambert N. King, M.D., Ph.D., is a board-certified physician in internal medicine who served as Medical Director of Cermak Memorial Hospital for the Cook County Department of Corrections from November 1974 to May of 1977, member of the staff at Cook County Hospital, consultant to the National Health Service to plan model jail health services, and has written and

---

1. The relevant part of Rule 706 is as follows: (a) Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The Court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless he consents to act. A witness so appointed shall be informed of his duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the court or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

2. Court's order of March 12, 1976.

lectured extensively on correctional medical care. He visited Menard on three separate occasions over four days, performed a detailed chart review of about 50 randomly-selected medical records, examined a large number of other medical records, and interviewed many Menard residents and staff.

2. Ronald M. Shansky, M.D., is a physician who is a member of the staff at Cook County Hospital, the Metropolitan Correctional Center of Chicago. Dr. Shansky also has a master's degree in public health and teaches public health at the University of Illinois. Dr. Shansky visited Menard on three separate occasions, over four days, performed a detailed chart review of approximately 30 randomly-selected medical records, examined other medical records, and interviewed many Menard residents and staff.

3. Richard Della Penna, M.D., is a physician who previously was the medical director of a program operated by Montefiore Hospital which provided health care services to inmates confined in institutions of the New York City Department of Corrections. Dr. Della Penna has written in the area of correctional health care and served as Chairperson of the Task Force which developed *Standards for Health Services in Correctional Institutions,* an official report of the American Public Health Association. Dr. Della Penna visited Menard on two occasions, conferred with staff and residents, inspected the facility and reviewed medical records.

The plaintiffs' three experts were:

1. Whitney Addington, a physician certified in the area of internal medicine. He has written extensively in the area of pulmonary medicine with a particular emphasis on tuberculosis and asthma.

2. Frank Rundle, a certified psychiatrist, who has been repeatedly qualified as an expert in federal courts and is currently an advisor to Judge Robert Ward of the Southern District of New York. He examined medical and psychiatric files during a four day visit to Menard in April of 1977.

3. Theodore J. Gordon, the Chief of the Bureau of Occupational Health and Institutional Hygiene for the Environmental Health Administration. He is certified by the Department of Agriculture as a food inspector and by HEW as a health care facility surveyor. He examined Menard in a survey on August 26, 1977.

The defendants' expert witnesses were:

1. Jay K. Harness, M.D., a board-certified surgeon who is Director of the Office of Health Care for the Michigan Department of Corrections and a consultant on correctional health care.

2. Kenneth Babcock, M.D., a physician who was formerly the Director of the Joint Commission on Accreditation of Hospitals from 1954–1964, and now is a consultant on hospital-medical problems of correctional institutions. Dr. Babcock visited Menard in 1973, and again in January and October, 1977.

3. John Grenfell, Ed.D., a professor at the Rehabilitation Institute at Southern Illinois University at Carbondale and a consultant on correctional staff training and treatment. His deposition testimony was admitted into evidence.

4. Patricia A. Nolan, M.D., M.P.H., a physician and diplomat of public health. She was formerly a public health physician in the New York City Department of Public Health from 1974 to 1976, and presently is employed by the Illinois Department of Public Health in the Office of Health Facilities and Quality of Care. She visited Menard in April and August of 1977.

5. Dennis Jurczak, M.D., a psychiatrist who is the Assistant Director of the Office of Health Care in the Michigan Department of Corrections. He formerly was employed as a psychiatrist for the Bureau of Prisons, U.S. Naval hospitals and two state departments of corrections. He visited Menard on one occasion prior to testifying.

6. Norman Freeman, a doctoral candidate in environmental health at the University of Michigan. For the past four years, he has been employed as an environmental health sanitarian with the Illinois Depart-

ment of Health. He has been an environmental health sanitarian for almost twenty years. Mr. Freeman inspected Menard during a four day study in January of 1977, and in a re-evaluation in August of 1977.

After the conclusion of the trial, the Court allowed plaintiffs to file a post-trial memorandum on November 1, 1978, containing proposed findings of fact and conclusions of law. The defendants also filed their own findings and conclusions in a memorandum filed on January 22, 1979. The plaintiffs were then granted leave to file a reply brief with supplemental findings of fact on July 9, 1979. Finally, on October 5, 1979, the Court heard final oral arguments summarizing these post-trial briefs. The Court has carefully considered all the voluminous exhibits, briefs, memoranda and evidence presented in reaching its decision. Before stating its findings of fact and conclusions of law, the Court will briefly discuss the current status of the law.

Initially, the Court must deal with the problem of the pendent state claim brought by plaintiffs. As previously noted, the Court's federal jurisdiction is based upon 28 U.S.C. §§ 1343(3), 1343(4) and 2201 et seq. The Court's pendent jurisidction was raised by plaintiffs who claim defendants failed to follow the laws and regulations of the State of Illinois. Specifically, plaintiffs alleged that defendants have not complied with Ch. 38 § 1003–7–2(3), Ill.Rev.Stat. which provides:

> (c) All institutions and facilities of the Department shall provide every committed person with a wholesome and nutritional diet at regularly scheduled hours, drinking water, clothing adequate for the season, bedding, soap and towels and *medical and dental care.* (Emphasis added)

In conjunction with this statute, the Illinois Department of Corrections has promulgated Administrative Regulation 836 which provides for medical services of a level and quality commensurate with good medical practice. In *Anderson v. Redman,* 429 F.Supp. 1105 (D.Del.1977), the Court considered the issue of overcrowding in a pris-

on setting under both the Constitution and the regulations promulgated by the Department of Corrections. In its decision, the Court stated that to the extent the IRM (Inmate Reference Manual) contains mandatory language, it has the same effect as a statute. *Anderson, supra* at 1119. The state law issue, therefore, is whether the medical services provided the inmates at Menard are of a level and quality commensurate with *good* medical practice.

■ As a general principle of constitutional law, a court should avoid a constitutional issue if the statutory claim is dispositive. *See,* e. g., *Hagans v. Lavine,* 415 U.S. 528, 543–48, 94 S.Ct. 1372, 1382–85, 39 L.Ed.2d 577 (1974). The Court in *Anderson, supra* at 1118 considered whether the resultant conditions violated state law and never found the need to address the constitutional issue. However, the constitutional decision avoidance issue is not iron clad. *See, Hagans, supra* at 546, 94 S.Ct. at 1383; *Siler v. Louisville & Nashville Railroad Co.,* 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). Nevertheless, if a court departs from that principle, it must have important reasons.

■ The Court has determined that for the following reasons this Court may address the constitutional issues brought by plaintiffs, although the application of state regulation could dispose of this case:

a. Although individuals are nominally defendants in this case, the relief must necessarily come from state sources. A decision predicated solely on state law may give the state the impetus to change that law and thereby perhaps, circumvent the relief, particularly where that relief is prospective and will be awarded to an unfavored, disenfranchised class of persons.

b. The constitutional principles emerging from this class type of litigation are still developing. If the state should, in fact, change their laws, it will be left without guidance as to the minimally acceptable standards necessary to comply with the Constitution. In view of the lengthy litigation in this case and the important rights at

stake, it would appear preferable to avoid another case based upon the same factual circumstances.

c. The real "pendent" claim in this case arises from an administrative regulation. In the *Redman* case, the regulations were promulgated as part of a settlement agreement in a prior class suit. Thus, the state could not repeal or change those regulations. In the present case, no such restrictions exist, nor is this Court persuaded that the defendants could not easily withdraw the present regulation.

Thus, the Court concludes that it may properly rule upon the constitutional issues present in this case, despite the presence of state claims.

■ Turning next to the subject matter, the Court notes that the plaintiffs are challenging the defendants' administration and servicing of the health care system at Menard. While federal courts have traditionally resisted attempts to become involved with the daily administrative problems in prisons, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). The Court feels that a policy of deference to state and prison officials is not required under the circumstances, particularly as prison disciplinary or security procedures are not at issue. *Todaro v. Ward, infra* at 54, *Newman v. Alabama*, 503 F.2d 1320, 1329–30 (5th Cir. 1974). Therefore, despite the possible intrusion into prison policy, the Court may examine the constitutional issues presented in this case.

The Supreme Court, in 1976, dictated the test for determining the constitutionality of a prison's medical care and services. Under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 251, a standard of "deliberate indifference to a prisoner's serious illness or injury" has been used to determine if an unconstitutional denial of medical services exist within a prison. Several courts since *Estelle* have further elaborated on the meaning of "deliberate indifference." In

*Todaro v. Ward*, 431 F.Supp. 1129, 1133 (S.D.N.Y.1977), that court reviewed the various standards. The court concluded that "to prove an individual claim of unconstitutional denial of medical care it is necessary to show either denied or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment." *See, Tolbert v. Eyman*, 434 F.2d 625 (9th Cir. 1970); *Edwards v. Duncan*, 355 F.2d 993 (4th Cir. 1966); *Bishop v. Stoneman*, 508 F.2d 1224 (2d Cir. 1974); *Fitzke v. Shappell*, 468 F.2d 1072 (6th Cir. 1972).

■ In *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977), the Second Circuit further enumerated the proper procedure when the whole health care system is constitutionally challenged. That court noted that:

> while a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures. Indeed, it is well-settled in this circuit that "a series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners." *Bishop v. Stoneman*, 508 F.2d 1224 (2d Cir. 1974). *See Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed. 102 (1975). When systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers. *See Bishop v. Stoneman, supra; Newman v. Alabama, supra*, 503 F.2d at 1328–30. *See also Cruz v. Ward*, 558 F.2d 658, 662 (2d Cir. 1977).

Using the above standard, this Court will now determine from the facts whether the medical practices and procedures at Menard were constitutionally infirm. Pursuant to Rule 52, the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

ENVIRONMENTAL HEALTH CONDITIONS

A. Living Units

1. Menard, built in 1878, is a maximum security facility and also serves as the Reception and Classification Center for felon sentences from Central and Southern Illinois. At the time of trial (and still present today) a maximum of 2,650 inmates resided at Menard. In order to accommodate these prisoners double celling occurred in the South and East Cellhouses, the Reception and Classification (R&C) Units and Galleries 5 and 7 of the Segregation Unit. This doubling of inmates in cells resulted in allowing only 18 to 32 square feet of space for each resident.

2. The East and South Cellhouses allow only 64 and 56 square feet, respectively for the two inmates doubled in each cell.

3. The Honor Farm dormitory is also overcrowded, providing only 35 square feet per inmate.

4. The cell space in the Reception and Classification Unit is inadequate to double cell new inmates.

5. These newly admitted inmates should be kept separated from the rest of the prison population until the initial medical screening procedures are completed. In light of the small space in each cell, this screening procedure should be completed within seven (7) days.

6. During a period from April 13, 1976 to June 11, 1977, the delay from admission to a physical examination ranged from 13 to 162 days. Many inmates had been transferred into the general population prior to their examinations. The defendants have failed to properly administer the screening process required in Reception and Classification, thus endangering the general population with the risk of disease.

7. The defendants have failed to provide the essential elements for basic personal hygiene to inmates in segregation. There was no hot water provided in the segregation cells until early 1977.

8. In addition, the number of shower heads are grossly inadequate. The inmates are allowed only one shower per week, which is not medically acceptable.

9. The shower rooms in segregation are improperly cleaned. Mildew and the risk of fungal infections are a result of this lack of cleanliness.

10. The general housekeeping level and sanitation conditions in segregation have always been extremely poor and remained inadequate at the time of trial. Open sewage, standing water, flies, roaches, dried food on galleries, adherent dirt and food residues and decaying garbage are all persistent problems found by defendants themselves, the Court's panel and Mr. Gordon on inspections of the unit. There is no credible evidence of any effective routine housekeeping or maintenance in segregation.

11. Photographs taken pursuant to Court orders in 1975 show numerous cells with toilets missing and uncapped waste lines. DPH. found numerous uncapped waste lines still present in a January 1977 inspection.

12. The conditions in segregation pose a serious health problem. Standing water in the service tunnels creates a breeding place for bacteria and insects. The accumulated dust and dirt could cause an asthmatic to have significant bronchospasms.

13. Defendants' sanitation inspections and provision of some inadequate cleaning supplies to inmates have failed to eliminate the unsanitary conditions in segregation. An effective uniform maintenance program is needed.

14. The sanitation of mattresses, mattress covers, sheets and pillow cases in segregation has been continuously inadequate throughout the pendency of this suit. The mattresses are dirty, torn, badly stained. Linen is old and filthy and infrequently changed. The sanitation of beds and linen is grossly deficient and incompatible with the Department's own regulations. The unclean bedding creates an increased risk of infection for inmates in the segregation unit. Bacteria can grow in such bedding.

15. Severe crowding in the fifth and seventh galleries of voluntary segregation also results in inadequate space per inmate, and contributes to the increased chance of infection and disease.

16. The Department's own Bureau of Detention Standards found lighting inadequate as early as March 1976. Light-meter readings in segregation cells at the time of trial in August 1977, found only 5 foot-candles of light in the cells. This amount of light is grossly inadequate for even brief reading.

17. The ventilation system in the segregation unit at Menard cannot provide adequate ventilation to the unit.

18. Inmates in segregation are only outside their cells for a maximum of one shower and one hour of exercise per week. This is not a medically acceptable frequency or duration of showers or exercise; it promotes deterioration of inmates physically.

19. The State of Illinois recognizes the right of inmates to a daily exercise period of one hour by statute. The Department denies this right to all inmates in the segregation unit without rationale.

20. Defendants frequently deny even the weekly exercise period to segregation inmates and have deprived some inmates of recreation for months at a time.

21. A number of medical problems arise from the lack of exercise. Men who are kept sedentary tend to develop musculoskeletal pain and tension. Lack of exercise is definitely related to cardiovascular morbidity (heart attacks). Lack of exercise makes epileptics more prone to seizure and makes it impossible for diabetics to balance their caloric intake against physical activity. Inmates with all of these chronic health conditions have been confined in the segregation unit at Menard.

22. Defendants' failures to provide adequate outdoor exercise and frequent showers to segregation inmates is not based on any sound medical or penological rationale. The only reason showers and exercise are not provided more often is a shortage of staff in the unit.

23. There is a direct relationship between lack of exercise and increased demand for medical services. Lack of exercise also leads to increased stress and is inimical to an inmate's mental well-being.

24. The segregation examination room has standing water and is not presently equipped to be used for its stated purpose.

25. The control cells comprised the last five cells at the northern end of 2 gallery in the segregation unit. The individual cells are the same size as regular segregation cells. They were, however, cut-off from the rest of the gallery by a concrete block enclosure with a solid door which was normally kept locked. From the time of their inception until at least March 23, 1976, the only visibility into these cells was through plexiglass enclosures. These enclosures allowed for no ventilation into the control cell area, and very little light. Several fires were started in the control cells in March 1976, which melted the plastic. The medical technicians stated that this made visibility into the cells extremely limited.

26. Individuals with a chronic health problem, including epileptics, diabetics, asthmatics, hypertensives and cardiovascular problems, as well as psychiatrically disturbed inmates, were placed in control cells. The problems associated with placing such inmates in the abysmal conditions in these types of cells would not be cured by having a physician pre-screen their placement. The problem was lack of observability and access, for correctional officers only checked the cells infrequently. No correctional personnel were normally stationed on the back of 2 gallery. The medical technicians did not normally check the control cells on their sick call in segregation. Without observation, an inmate could become ill and die within minutes in these cells.

27. Inmates in the 'box' were permitted only the barest of necessities; a mattress on the floor, a blanket and the clothes they were wearing. They were given no personal property, and even after hot water was provided to the rest of segregation, it was not provided in the control cells. This lack

of an essential element of personal hygiene is another clear violation of DOC's own regulations. (A.R. 804, p. 6, par. 6) There was no evidence of any cleaning supplies or brooms with which inmates could clean their cells anywhere.

28. Although the defendants have discontinued use of the control cells, and have destroyed the concrete enclosure, the Court finds that the previous use of these units must be condemned. The placement of an inmate, particularly one who is emotionally disturbed or chronically ill, is particularly alarming as no physician even visited these cells, despite recommendations since 1973.

29. The Court further finds that while the defendants now assert that the issue of the control cells is moot due to the removal of the concrete wall surrounding these cells during the middle of trial, this Court received no credible assurances that the cells would not be returned to their former use after judgment is rendered.

B. Medical Unit

30. There are significant deficiencies in the environmental conditions within the building housing medical services at Menard. As early as February 1975, the housekeeping was noted as minimal and the unit needed a good going over with soap and water. The sanitation and housekeeping was still unacceptable in some areas of the building in August 1977. There is no separation of the clean and soiled linen which violates Hill-Burton standards for ambulatory care facilities, a problem noted by the Department of Public Health in their January 1977 sanitation inspection and by Mr. Gordon in August 1977.

31. The surgical suite at the institution is full of critical deficiencies from an environmental health standpoint. Instruments have been improperly sterilized, thus creating a risk of contamination. The suite was cluttered and had an accumulation of dust. There is no routine cleaning plan or written housekeeping procedure, although they should be a standard feature for a medical facility.

32. Two potentially dangerous defects in the surgical area are the operating room floor and the flammable gases stored just outside the room. The operating room with nonconductive flooring and tanks of flammable cyclopropane gas in the room and nitrous oxide outside the room presented the risk of explosion and fire.

33. The lack of a clinical sink with knee or foot action faucets in the doctors' examining room is another critical defect. There is a danger of cross contamination from sink valves when the doctor washes his hands between examinations of patients.

34. There are two rooms used in the medical unit to "isolate" individuals with suspected or confirmed communicable diseases. These rooms are inadequate for the purposes of isolation. They are not designed as "ventilation rooms." There is very little air flow in the rooms and no method for exhausting this air out of the unit, which is necessary for the control of infections.

35. Defendants' procedures manual was a copy of a hospital's manual not adapted or specifically written for Menard. This must be done in order to be of use to the professional staff at Menard.

36. The Court recognizes that the construction of a new medical facility which is projected for completion in the Spring of 1980, will greatly alleviate future health problems in the medical unit. However, the use of the old facility during the litigation, and the resulting harm, does not render this issue moot.

C. Food Services

37. The inadequacies in the food storage preparation and delivery are well-documented over a long period of time and reflect a continuing pattern of neglect by the Department. A Department of Public Health (DPH) food services inspection in 1972 recommended closer supervision of inmates in all dishwashing and food service areas, replacement of some utensils and equipment and indicated the need for three-compartment sinks for adequate sanitation of items.

38. No follow-up inspection was ever conducted by DPH. The January, 1977, DPH inspection conducted as a result of this lawsuit found these same problems in the food services four and one-half years later. In April and July, 1976, the floors in the kitchen were generally filthy, toilets next to the showers off the kitchen area were heavily contaminated with feces, and garbage was uncovered. Vats and trays of food in the walk-in refrigerators were left uncovered and separation of used and unused food was poor. These unhygienic conditions pose a real health hazard at the institution. In spite of this, there was no apparent effort made to correct these dismal conditions or to implement proper sanitary policies and procedures.

39. At the time of trial in August, 1977, over a year after the panel's report and after two inspections by the state Department of Public Health pursuant to the panel's recommendation, serious public health problems still exist in food services areas at Menard. The ventilation in the kitchen is insufficient to remove odors and excess heat. There are plumbing problems in the cooking area—the lack of vacuum breakers and submerged inlets which could result in back seepage of sewage into the potable water supply, also noted by the Department of Public Health in their inspection eight months earlier. There is no backflow prevention device on the dishwasher. These deficiencies may result in the spread of congestive diseases if the waste water is drawn into the drinking water system. After washing, the cups and plates were being replaced on the same racks they were on when dirty. The improper handling and sanitation of the eating and drinking utensils provides the opportunity for transmission of trench mouth and other diseases.

40. The handwashing and shower facilities for the kitchen workers is inadequate. The shower room has no ventilation; obnoxious odors from the toilet were present on an inspection at the time of trial. The floors of the shower room are porous and there was standing water. This is conducive to bacterial growth which causes athlete's foot and other skin diseases. The lack of basic facilities for personal hygiene is significant; a large majority of outbreaks of food-borne disease are associated with people not washing their hands properly and then contaminating food.

41. The bakery area was still being used at the time of the panel's first inspection; the presence of insects was common in this section of food services. Rat droppings were present between the oven and the wall in the bakery and mouse droppings in the yeast storage room at the time of trial.

42. These are critical public health problems, and the insect and rodent control must be upgraded in these areas. The deep fat fryers are quite unsanitary, and there was no fire extinguishing equipment around them. Indeed there is no fire safety in the entire food services area and there is a present danger to both inmates and employees if there is a fire in that area of the institution.

43. The inmates dispensing the diet trays have no training or instruction in differentiating between the number of calories on different diets. The workers in the food services should receive training in food-handling techniques and proper hygiene, as well as in their duties in an institution serving meals to a population the size of Menard. At present, there is no periodic check of inmates who handle food at Menard.

D. Defendants' Failure to Remedy Conditions

44. The abysmal conditions throughout the housing units, segregation, reception and classification, the medical unit and food services have continued to exist for years and, indeed, as the panel indicated on their reinspection, have worsened in some respects at Menard. This state of affairs is even more disturbing to the Court in light of the numerous instances where conditions and problems have been brought to the attention of the administration, both at the institution and at the department level. Defendants have also violated their own statutory authority and regulations.

45. The Illinois Department of Public Health has an institutional inspection program component, presently administered by Mr. Freeman. This section of DPH did a survey of Menard as early as 1972 but performed no other inspections until 1977 when their surveys were in response to this lawsuit. This latter survey is a considerable variance to the Court's panel's reinspection, conducted only two weeks later. The questionable impartiality and lack of enforcement powers of the Department of Public Health limits this department's usefulness in correcting deficiencies at Menard.

## HEALTH CARE SERVICES

### A. On Site Physician Services

46. The level of physician services provided at Menard has been and is significantly less than any recognized standards, as well as the number of medical hours determined to be minimally required by the Court's panel.

47. The number of scheduled weekly hours of primary medical care provided by physicians and the inmate populations to be served are as follows:

| Period | Scheduled Hours/Week | Population (Beginning and Ending) |
|---|---|---|
| 5/73 to 9/74 | 25 hours (Dr. Wham) | 1659 – 1357 |
| 9/74 to 4/75 | 4½ hours (Dr. Vidal) | 1357 – 1515 |
| 4/75 to 8/75 | 8 hours (Drs. Vidal & Zemlyn, includes surgical coverage) | 1515 – 1776 |
| 8/75 to 3/76 | 2½ hours (Dr. Zemlyn, includes surgical coverage) | 1776 – 1958 |
| 3/76 to 9/76 | 8 hours (Dr. Khan) | 1958 – 2131 |
| 9/76 to 3/77 | 3 hours (Dr. Vidal) | 2131 – 2380 |
| 3/77 to 5/77 | 43 hours (Drs. Vidal & Lendrum) | 2400 + |
| 5/77 to 8/77 | 80 hours (Drs. Lendrum and Tabilon) | 2500 – 2600 |
| 8/77 to 10/77 | 86 hours (Drs. Lendrum, Tabilon, Platt) | 2500 – 2600 |
| 11/77 to end of trial | 46 hours (Drs. Lendrum and Platt) | 2500 – 2600 |

3. *Report of Medical Panel Concerning Menard Correction Center,* I, p. 5 (hereinafter *Panel Report*)

4. Panel Report II, p. 4.

5. Panel Report II, pp. 3–4.

48. Actual hours of on-site primary medical coverage were often less than those scheduled. Physicians assigned to perform sick-call frequently did not appear or left prior to completion of sick-call due to outside medical responsibilities. Defendants' own records document the fact that this practice went on for many years.

49. The members of the Court's panel in their first report of October, 1976, found that the physician services were inadequate to meet minimal standards. Dr. King testified that the then-existing coverage of 8 weekly primary care physician hours was "grossly substandard." The panel concluded that at that time, for a Menard population of 2000 men, a *minimum* of 100 hours of on-site physician coverage was necessary.[3] This conclusion was based on a systematic assessment of the medical services provided to plaintiffs. Moreover, the adequacy of this level of physician services was dependent upon the employment of a sufficient number of physician extenders.[4]

50. At the time of the medical panel's reinspection on September 20, 1977, the number of hours of physician coverage remained inadequate to provide minimally acceptable medical services to the increased inmate population of 2500–2600 persons.[5]

51. During testimony, Dr. King advised that approximately 125 hours of primary care coverage with an adequate number of physician extenders, would be necessary to provide adequate physician services for a Menard population of 2600.

52. The panel's medical audit on reinspection revealed numerous deficiencies in the manner in which the physicians performed, including: intake physical examinations; lack of continuity of care; and physicians' notes absent or unacceptably cursory. The panel found that practically all of the deficiencies could be corrected if there was adequate physician time.[6]

6. The Panel stated: "All of these deficiencies except one could be corrected if physicians had adequate time to examine patients more thoroughly, write or dictate proper notes, and upgrade the coordination among the various practitioners. The current existence of such deficiencies is reflective of a continuing imbalance in the ratio of population to quality and quantity of physician and physician extender coverage." Panel Report II, p. 4.

53. Due to inadequate physician coverage, the panel, during its first inspection, noted that numerous medical tasks were performed by unlicensed and unqualified medical technicians, nurses or inmates. This included prescribing and administering controlled medication without authorization from or consultation with a physician. This also includes administering prescription medicine through the use of a set of standing orders. This formal delegation of authority to unqualified personnel was an extremely dangerous and questionable medical practice.

54. During the panel's second inspection, the use of standing orders and the prescribing of medicine by unlicensed personnel no longer occurred. However, the Court recognizes that the mere fact this practice existed indicates a poor past medical coverage and supervision.

B. Chief Medical Officer

55. The continued failure of the defendants to secure the services of a chief medical officer at Menard and the necessary medical direction which that individual should provide, has obstructed the developing of a minimally adequate health care delivery system at the institution.

56. Dr. Wham was the Chief Medical Officer at Menard until September 1974; however, his recommendations for designing and upgrading a health care system at Menard were not implemented by departmental level defendants.

57. In their first report the panel found that none of the three part-time physicians actually functioned as the chief medical officer who should be responsible for the direction and in-service training of ancillary medical staff. The panel stressed the need for a physician to become involved, on-site, in a total reorganization of the health care delivery system; and not simply putting in hours of direct patient services.

58. Although during part of the trial Dr. Tabilon served as chief medical officer, he did not assume any supervisory or advisory role, due to the backlog of needs in direct patient care.

59. As a result of inadequate medical direction at the institution, numerous conditions and practices occurred which are unsound medical procedures. Those problems include:

(a) There is no effective medical direction or review of the sick call screening system which controls access to the physician. Written screening protocols for use by ancillary personnel must be made in order to properly effectuate efficient medical screening of inmates.

(b) No physical examination and screening of new health service personnel have been implemented by the end of trial. These procedures are essential to guard against the transmission of disease and to properly determine the new employee's ability to work in this type of environment.

(c) The medical supervisor failed to establish in-service education for the ancillary staff, a systematic medical audit or a peer review. All these programs are necessary to safeguard the quality of the medical services which are provided to the inmates. The peer review will help the physicians to accept responsibilities for their medical decisions and instructions. All these programs are necessary to maintain adequate medical services to the plaintiffs.

60. The panel stressed throughout both reports and at trial that stable physician coverage was a critical element of an adequate system. The record at trial establishes quite clearly that erratic and insufficient physician services have existed during the four year term of this litigation. Dr. King testified that since the involvement of the panel in March, 1976, the pattern has been one of being unable to recruit adequate numbers of staff to meet the needs of the population.

61. The panel found the past policy of offering full pay for half-time work to be a discouragement to full-time commitments, and that the salary for doctors was markedly low. Increased physician salaries were

only obtained due to the effects of this lawsuit, as was the abandonment of the double salary provisions.

62. Departmental-level health care personnel provided limited assistance to Menard in the area of physician recruitment and then, only after the panel's first report.

63. Budgeting for physician services has been chaotic and unrealistic. A pattern of insufficient initial requests and subsequent unnecessary budget cuts in physician services occurred in fiscal years 1977 and 1978.

64. Although defendants have stated in post trial arguments that sufficient physician coverage presently exists at Menard, the Court finds that a pattern of inadequate coverage and insufficient recruitment occurred prior to and during the trial. This resulted in the dangerous practices by the medical staff to compensate for insufficient physician coverage.

## C. Ancillary Personnel

65. The vast majority of medical services provided to residents at Menard are delivered by correctional medical technicians (CMTs) and nursing staff. This personnel administers prescription medications and is responsible for emergency care when a physician is not present at the institution. CMTs were also responsible for referring residents with medical problems to a physician at sick call and were required to perform laboratory procedures, inhalation therapy, administer blood and IV fluids and physical therapy treatments. CMTs also prescribed and administered drugs and treatment pursuant to the standing orders in effect at Menard until February, 1977. The Court's experts concluded that this level of responsibility far exceeds the CMT's training.

66. From May, 1973 to April, 1975, there were never more than four CMTs at Menard to serve a population of 1500. Defendants were aware that this staffing was inadequate, having been advised in 1973 that at least two medical technicians and additional nurses were needed. However, it was over two years before the defendants increased their staffing to the levels recommended in 1973.

67. The nine CMTs employed at Menard at the time of the panel's first inspections in the summer of 1976 were grossly overburdened and markedly understaffed. The panel concluded that for sick-call screening (triage) alone, minimum staffing for CMTs at Menard requires employment on the day shift (7 A.M.—3 P.M.) of at least one medical technician for every 200 inmates.

68. The number of CMTs had increased by the time of trial, but the turnover rate remains a problem in providing a continuity of care. Proper recruiting incentives are necessary.

69. While all but one member of the ancillary staff is either a registered nurse, emergency medical technician or licensed practical nurse, the defendants have not provided for training in physical diagnosis, a prerequisite for sick call screening.

## D. Health Care Screening

70. The screening of inmate medical complaints is one of the ancillary personnel's most important functions at Menard. Through this process inmate access to a physician is controlled. Prior to the first inspection by the Court's panel, defendants had been informed by their own expert and employee of the deficiencies in the manner in which ancillary personnel were being utilized in the screening process. Despite this information, the only training session given to the Menard staff was in November of 1975. No new employee hired after that lecture was given this training or provided with the written materials.

71. When the panel first inspected Menard this duty was performed by the CMTs who not only made determinations regarding referrals to physicians, but also frequently made independent decisions to administer prescription medications pursuant to the "standing orders." The panel found that these responsibilities were clearly beyond the limits of the CMT's training and qualifications.

72. The panel still found the screening process inadequate during its second visit,

citing lack of proper training and insufficient staff as major problems. The teams exercised personal judgment in determining whether an inmate would see a physician.

73. The Court recognizes that proper screening is a vital element of adequate medical services. Written protocols and properly trained staff members are necessary to accomplish this goal.

74. The physicians, at time of trial, still did not properly review the screening logs in order to check the decisions of the screening teams. In addition, the information in each log was unstandardized and too cursory for proper review, had such a procedure taken place.

E.   Ancillary Services

75. CMTs were routinely administering intravenous therapy and giving respiratory treatment without proper supervision during the panel's first inspection. By the second visit, this practice was finally stopped.

76. Medication was commonly being distributed by guards, at least until June of 1975. After that date, medical records show that either CMTs did not properly distribute the medication, or were too busy to properly complete the file. This haphazard system of distribution is inadequate to meet the needs of the residents at Menard.

77. The deaths of inmates Willie Graham, Chester Graves and Kurt Robinson might have been prevented if the institution staffed the 11:00 P.M. to 7:00 A.M. shift with personnel trained in physical diagnosis. The review of deaths at Menard indicates a level of emergencies showing the need for personnel trained in physical diagnosis. The staff of CMTs and LPNs at the time did not meet this criteria.

78. The present medical emergency plan and crisis procedure at Menard are deficient and do not meet the need for procedures enunciated by the panel. They also fail to comply with the administrative regulations of the Department[7] or with recommendations of the office of the Medical Services

Administrator made as early as February, 1975.

79. Laboratory services were medically unacceptable and unreliable at the time of the panel's first inspection. A hiring of a laboratory technician is essential to prevent costly delays which result when this work is sent out.

80. Microbiology services, at the time of trial, remained deficient in both utilization and availability.

81. At the time of the panel's first inspection, the radiology services were deficient in that long delays existed in sending out and receiving reports of x-rays and in the filing of these reports. In addition, there was no indication Menard physicians had read the x-rays prior to sending them out.

82. At the time of trial, a new radiology service had been in place for several months and the panel found that there was an acceptable turnaround time for radiology reports.

83. At the time of trial, the panel found medical records remained disorganized and failed to meet minimal standards. The system was not properly coordinated to insure that all information and test results be filed in the inmate's records within a reasonable time. Delays of over one year which existed at the time of trial, is an unacceptable medical practice.

84. Untrained inmate nurses were inappropriately used by defendants to prescribe and distribute medicine, participate in sick call screening, work on medical records and the laboratory. These practices were gradually discontinued between 1974–1976. These inmate nurses as of the date of trial were confined to orderly positions, although they were still confined to monitoring inpatients in the medical unit. This latter practice should be replaced by a call light system.

F.   Quality of Medical Care

85. A primary component of a minimally acceptable correctional health care system .

7. A.R. 836 II, N.

is the implementation of procedures to review the quality of medical care being provided. A system of peer review and/or medical audit is the established method by which medical care may be evaluated and deficiencies corrected. The defendants have long been aware of the need to implement such a function into their state system, as well as at Menard, but this process has never been established. The defendants' failures in this regard have prevented them from detecting the inadequacies in their health care services and have resulted in the perpetuation of deficiencies which have resulted in unnecessary pain, harm and even the deaths of inmates at Menard.

86. The panel, during its first investigation, conducted a medical audit of 30 randomly selected cases. The panel concluded that the care provided at Menard, as evidenced by these records, does not meet even minimally acceptable medical practice.

87. During the second medical audit in September, 1977, the panel concluded that while some individual inmates were given proper care, many others were not.

88. At trial, Dr. King cited numerous examples of inadequate medical care, such as physicians not ordering essential tests, or the failure to perform them if needed, incompleted medical records and treatment inconsistent with diagnosis. Dr. King concluded such deficiencies occurred frequently and were indicative of a lack in the quality of care.

89. Based upon the testimony of Dr. King and the panel's opinion in its second report, the Court feels there is a serious question as to Dr. Lendrum's professional competency as a physician. No adequate evidence was introduced by defendants to resolve this doubt, either by way of specific cases or by credible assurances that a system of peer review or medical audit would be implemented.

90. Defendants have continuously failed to obtain sufficient physician coverage to perform physical examinations on a timely and regular basis.

91. Until one day prior to the panel's first inspection, this function was delegated to a medical technician. At the time of trial, Dr. Lendrum was performing this duty, but the panel determined that a significant backlog existed. In addition, the panel questioned the completeness of examinations.

92. The Court also heard evidence on many deaths that had occurred at Menard during the pendency of this lawsuit. The panel had requested defendants to furnish the records of these deaths, as well as any resulting departmental investigations. The Court's expert testified that these deaths merited extensive physician review (as part of an on-going monitoring or medical audit effort), but that none of these cases had been the subject of such a process. This Court is alarmed not only at the lack of a regular system of review of deaths, but also at the complete failure of defendants' proof to address any of the following death cases testified to by the Court's panel and plaintiffs' expert, Dr. Whitney Addington.

(A) Inmate Robinson died on December 21, 1974, after being admitted to Menard's medical unit and treated only by an unlicensed medical technician. This case was an example of a medical technician virtually "practicing medicine." While Robinson was suffering from the toxic effects of ethyl alcohol, a medical technician first administered a major tranquillizer, the use of which was not indicated; and thereafter, administered epinephrine, intramuscularly. Epinephrine should not have been given in this instance and would have only been appropriate for an asthmatic in distress. Moreover, this drug should be administered subcutaneously and not intramuscularly; this improper method of administration could have side-effects on the heart. Robinson's condition then became critical and when a different medical technician determined there was no pulse, he then administered epinephrine directly into the heart muscle. This is a "very desperate measure" used by technicians with 350 hours of training. This technician did not even have the basic course in CPR.

The two physicians providing services at the institution at this time, Vidal and Zemlyn, state they had no involvement in the treatment given Robinson, and that they would not have ever authorized an intercardiac injection by a CMT. However, this technician was never reprimanded or admonished for his actions in this case. Dr. King testified that the entire course of treatment was "grossly improper." He stated that Robinson's life might have been saved if given the benefit of an acceptable level of care, and that Menard did not have staff on duty who could properly deal with this situation.

(B) Both Dr. King and plaintiffs' expert, Dr. Whitney Addington, testified to the circumstances surrounding the tragic death of Mr. Willie Graham on June 15, 1975. Prior to commitment to the Department of Corrections, Graham was a chronic asthmatic who generally responded to traditional therapy associated with the treatment of asthma. Such treatment would include the use of brochodilators; and in particular, the use of epinephrine, subcutaneously, and aminophylline, intravenously, in the event of acute attack. The use of sedatives is contra-indicated in the treatment of acute asthmatic patients and could cause ventilatory failure.

Department records indicate that Mr. Graham was confined to Menard from February 11, 1975, to March 25, 1975, and from May 7, 1975, to the date of his death on June 15, 1975.

During this brief period of time Mr. Graham suffered recorded asthma attacks on at least fifteen occasions. His "treatment" was devised and carried out, for the most part, by unlicensed, untrained and unsupervised medical technicians and inmates, who, without prior consultation with a physician, prescribed and administered a wide variety of medications, which could legally only be prescribed by a physician. Moreover, these medications were, in repeated instances, inappropriate, contra-indicted, of insufficient dosage to be effective, in excessive dosages which may have resulted in toxicity; and, in eleven (11) occasions during recorded asthma attacks, aminophylline was given by intramuscular injection, a totally unrecognized, painful method of administration.

On the few instances when Graham was seen by a physician, Dr. Vidal, acceptable care was still not given. Medications that were at odds with acceptable practice were prescribed, necessary laboratory tests were not ordered, and proper documentation of physical findings was not made in Graham's medical record. In addition, Dr. Vidal failed to terminate the intramuscular injections of aminophylline. Instead he verbally ordered, on June 13, 1975, that intravenous bronchodialators and inhalation therapy, the essential treatment for asthma, be denied and, instead, substituted the administration of Sparine. This drug, a tranquillizer used in the treatment of psychosis, is a respiratory depressant which can cause respiratory failure in an asthmatic who is in or going into ventilatory failure.

Therefore, when Mr. Graham suffered an asthma attack on June 14th and June 15, 1975, he was administered Sparine and use of intravenous bronchodialators were denied. At that point, carbon dioxide was building up and only a mechanical ventilator could save him. Instead, he was transferred to segregation on June 15, 1975, and died within hours in his cell.

Dr. Addington analyzed the treatment of Mr. Graham in three phases. In reference to the acute asthma episodes, the doctor stated that they should have been treated more vigorously in an inpatient setting. He states that it is unlikely that Graham's acute attacks were ever completely broken. Regarding the chronic management between acute episodes, Addington explained that the care was "chaotic" with many people of varying expertise providing varying and haphazard therapy with no rationale, including the "incredible" intramuscular injections of aminophylline that clearly were not working. He stressed the need for all of the personnel to have arrived at a uniform course of treatment. Dr. Addington lastly addressed the care provided near the time of death. He stated that here the failure had been in not making the diagno-

sis of ventilatory failure, that Mr. Graham had not been hospitalized when needed and the last chance to save his life had been lost. The doctor emphasized that Graham was not rare among asthmatics, that this was a straightforward case that has not been very well cared for, and that Mr. Willie Graham was rare only because he died.

The panel also reviewed Graham's case. Dr. King stated that a high level of skill and judgment was required at Menard on the night shift due to the level of pathology at the institution. The panel concluded that the decisions the CMTs were forced to make in Graham's case were not isolated. The panel's opinion was that Sparine was contra-indicated in the treatment of acute asthma and that it was not reasonable, from a systemic perspective, to require a CMT to determine and cope with adverse reactions to this drug. King stressed that the treatment ordered by the physician in this case demanded peer review.

(C) Inmate Chester Graves died at the institution on February 3, 1976. Graves had been returned to the institution after having had a vein ligation. He was admitted to the institutional medical unit by a CMT at about 5:30 P.M. with swelling, shortness of breath, and chest pain. Graves died the following morning and was found to have had a pulmonary embolism.

Dr. King concluded that in this instance, the CMT was clearly unable to make a simple diagnosis of "classic symptoms" on the night of admission and that a person of appropriate skill would have sent this man immediately to a full-service hospital where he would have received an anti-coagulant. King stated that cases like Graves indicated that a high level of skill and judgment is required at Menard during the night-time hours. At the close of trial, there was not even a registered nurse at the institution at night.

(D) Mr. Kenneth Daugherty died at Menard on April 15, 1976. Dr. King, on August 31, 1977, reviewed his medical records at trial concluding that Daugherty's life may have been saved if qualified personnel

had been available to interpret an E.K.G. and physical symptoms which clearly suggested the ultimate cause of death. King testified that the records indicated: the delegation of responsibility for medical care to an unlicensed, unqualified person; the lack of an emergency medical system; the lack of procedures for transferring a patient to another facility for proper monitoring of his condition; and lack of medical audit procedures. In this last regard, King stated that the CMT involved in this case should have been reprimanded by his superiors and that Dr. King would not have retained this CMT in his own system in view of the CMT's conduct in this case.

(E) Inmate Hansen died at the institution on June 22, 1977. This inmate's case was reviewed at trial by Dr. King. The panel had noted in their second report that the defibrillator at the institution was designed for pediatric use and was inadequate for treating a large size adult. King testified that Hansen was a large man of 240 pounds and that the unit at Menard was not able to generate enough power to perform defibrillation on a man of this size. Medical records indicate several unsuccessful attempts to cardiovert the patient with the defibrillator. King stated that an adequate unit might have saved his life.

Dr. Tabilon was employed at the institution at the time of Hansen's death. Dr. Lendrum stated that he had never used the defibrillator, but that Dr. Tabilon had on one occasion. Ms. Pietsek testified that Dr. Tabilon had used the unit on one occasion but that she did not get any notice from him after he had used it that it was inadequate. She stated that in August, 1977, when she contacted Tabilon regarding equipment needs for a disaster plan that he requested the purchase of an additional, portable unit. A timely review of this death would have disclosed the defibrillator's inadequacy.

93. The Court finds, based on results of the panel's medical audits and supporting testimony as to specific examples, a well-defined pattern of substandard medical care to inmates in Menard over a three and

one-half year period up to and including the time of trial.

94. The Court further finds, on the basis of the totality of evidence heard, both that relating specifically to the death cases and facts establishing systemic inadequacies, that the defendants' own conduct in operating and maintaining this substandard system was the proximate cause of the deaths of the inmates.

## G. Mental Health Care

95. Dr. Rundle, whom the Court recognizes as a qualified expert in mental health care services, found that the defendants have not properly assessed all newly admitted inmates. The evaluations, at the time of trial, were not conducted in a timely manner, which resulted in delays for those needing specialized help.

96. Rundle also finds patterns of placing potential suicides in the control cells, although unknown to the administrator of the medical unit. Care of these suicidal inmates was also delegated to medical technicians, instead of being under professional observation.

97. In the area of ongoing therapy and counseling, Dr. Rundle and defendants' own experts, noted numerous deficiencies. Dr. Rundle stated that clinical psychologists had to be hired to provide both group and individual therapy. At the time of trial no such personnel were providing these services. In addition, in selected cases, psychiatrists should be involved in rendering ongoing psycho-therapy, however, defendants were also failing to provide this requirement.

98. Rundle also testified that the reports prepared by the institutional psychiatrists were "seriously deficient in most cases" and that they failed to contain the essential elements of an adequate psychiatric evaluation, including a basic mental status examination. This physician stressed the need for having adequate written reports because of the possibility of transfer to other institutions.

99. Defendants' own expert testified to the gross lack of adequate counseling services at Menard. At the time of trial defendant-Assistant Warden McGinnis testified that in Clinical Services there were 19 employees (a clinical services supervisor, 3 casework supervisors and 15 counselors). Of the 18 employees then identified as being theoretically available for direct counseling services, 8 had no formal education or training in counseling. McGinnis testified that to his knowledge only 7 of these personnel actually provided either group or individual counseling services. Group counseling services were comprised of 7 groups with a total participation of 64 residents, and 54 residents were receiving individual counseling.

100. McGinnis explained that the counselors had an average caseload of 155 persons and that at that level, counseling was not a job requirement. He explained that the counselors had a large number of administrative tasks including report preparation which were basic job responsibilities. While he planned to hire 3 additional counselors reducing the average caseload to 135, he stated that unless caseloads were 100, counseling would not be a job duty but would remain a matter of individual motivation on the part of these employees. Dr. Grenfell testified on deposition that the Department's own policy of a 100 person caseload was generally accepted as being the staffing that was minimally required to provide adequate counseling services. He stated that presently the counselors had insufficient time to provide necessary services and that he had recommended to the defendants that they meet the 1:100 caseload ratio. This would require staffing of 26 counselors at the 2650 population level at the time of trial. At the time of trial, the counselors could not provide such services, due to administrative duties and large groups of about 155 people.

101. Defense expert Jurczak testified that psychotropic medications comprised 50% of the 80,000 doses of medications dispensed monthly at Menard. He noted a high rate of minor tranquilizers and condemned their use in a correctional setting.

Jurczak concluded that the defendants were using too many drugs and not enough counseling.

102. Based on a review of current institutional records at the time of trial, Dr. Rundle noted a pattern by the Menard psychiatrists of prescribing both major and minor tranquilizers, particularly Valium, to patients simultaneously. He stated the combination was not indicated, generally unacceptable and had no rational pharmacological basis. With regard to the major tranquilizers, Dr. Rundle testified that the dosages were not sufficient to arrest the symptoms of psychosis. If they were being prescribed for an inmate suffering such mental illness, it is likely that the medication would have no perceptible effects; for a non-psychotic person, the dosages would result in the subject feeling lethargic and sleepy, and experiencing impaired muscle coordination and thought processes—an effect uniformly described as unpleasant. As to non-psychotic residents, Dr. Rundle testified that the drugs were being used mistakenly or to simply control behavior.

103. Defendants failed to properly monitor and evaluate patients who were receiving psychoactive medication. The medication reviews were scheduled or delayed by a layman without any input from a physician.

104. Defendants stated that they rely upon the services available at the Menard Psychiatric Center to provide in-patient care for inmates who are seriously mentally ill. Dr. Rundle, who inspected the Psychiatric Center on behalf of the Justice Department testified that the treatment level available for its 280 person population at Menard Psychiatric is grossly deficient, and could not fulfill the needs of the system.

105. A major problem occurred in the processing of transfers from Menard to the Psychiatric Center. Unacceptable delays existed in the transfer of residents who were in need of psychiatric care. These inmates were confined in segregation or control cells during the period awaiting transfer. Dr. Rundle condemned such placement and also noted a pattern of inmates suffering self-inflicted injuries during this period of delay.

106. In addition to an inadequate number of counselors, there also exists a lack of sufficient coverage by clinical psychologists and psychiatrists. Fifteen weekly hours of coverage by a part-time psychiatrist is totally inadequate to serve the needs of the residents at Menard. Two full-time psychiatrists (or 80 hours) are needed to provide minimally adequate mental health services.

107. Unacceptable delays existed not only in the referrals of possible suicidal inmates to psychiatrists, but delays also existed in referrals made by the hospital staff. Evidence showed a patient waiting seventeen days to see a psychiatrist after notifying the hospital staff of difficulties with his medication, a major tranquillizer.

H. Organization and Administration of Health Care

108. Departmental defendants have never provided leadership or consultative services in designing a health care delivery system at Menard. Patmon is the head of the Office of Medical Services Administration (OMSA). His job description includes evaluating the medical needs of the institution and devising a system to meet those needs. Despite this needed Departmental level input, Patmon has neither the authority, the budget nor the expertise to fulfill those responsibilities. Patmon's job, in fact, is purely advisory—he has no real authority to control the various aspects of medical care at Menard. However, Patmon has failed to respond even to 'perceived needs' at Menard, and has done nothing to ascertain the needs of the institution or to assist in the design and implementation of a system of health care delivery. In addition, no provision for internal and external medical care audits have been established by the Department of Corrections.

109. Patmon has only a 'review and comment' function regarding medical budgets after they are drawn up and he has no idea who defends medical budget packages in the legislature. OMSA did not even

have this function until the FY 76 budget. However, in reviewing the medical budgets, he has failed to properly evaluate the medical needs of Menard. As a result, there was a continuation of grossly inadequate services to the institution. In concluding this review, Patmon also failed to respond to specific requests made by Menard's health care personnel.

110. In addition, defendants have persistently failed to take any actions to inform themselves of the actual conditions at Menard. Moreover, they have ignored or failed to implement sound recommendations made by their own consultants and the Court's panel. The Department even resisted the appointment of the medical panel, asserting they "strenuously object to paying any part of the cost involved in obtaining the services of a panel of experts since such panel is sought by plaintiffs in aid of proving *their* case and, in the defendants' opinion, such panel is not necessary in the interests of a fair disposition of this suit.[8]

111. The Department of Corrections has failed to have a physician as medical director to specifically review the performance of the physicians and the medical care services at Menard. The Department of Corrections has, in fact, failed to properly monitor the health care in this institution or to conduct a medical audit of the physicians. This failure is particularly demonstrated by the cursory review conducted after the deaths of inmates Graham, Hutson, Daugherty and Nash. Patmon failed to extensively investigate these deaths in spite of his obligations to do so.

112. In view of the defendants' consistent lack of official responsibility, this Court must conclude as the panel did, that "only an ongoing independent, objective review process can monitor the medical program and health conditions in such a way as to insure the minimal standards of care are provided."[9] The Court further finds that the evidence at trial proved that the Illinois Department of Public Health in the performance of its duties under the Prison Inspection Act, has not fulfilled this need for independent monitoring.

113. A final and particularly condemnable example of the indifference at the Department level is the continued rise in the population at Menard in the face of DOC's inadequate procedures and staff, inability to recruit and incompetence to organize a system of health care delivery at the institution. The deficiencies in organization, recruitment and staffing are all problems existing over a long period of time and well-known to the Department since at least 1973. For example, Babcock also noted the salary scales for RNs and policy of paying doctors full salary for half-time were disincentives to recruitment. In addition, the Babcock Report indicated that Menard was in an area where there was a lack of professionals making staffing extremely difficult. The Department ignored the problem at that time and has still not responded to these deficiencies. In response to the panel's first report regarding unqualified ancillary personnel, DOC asserted they would hire RNs in those positions. Ms. Pietsek subsequently admitted she was filling vacancies with LPNs and CMTs because she could not recruit RNs in the area.

114. The physician staffing at Menard has never been stable since Dr. Wham resigned in September 1974. Yet, defendants continued to look to part-time services of doctors from this isolated area to supply medical coverage. These deficiencies persisted until the medical panel in their first inspection report in November 1976, found "a systematic denial of medical services which is due both to institutional conditions and to an extreme lack of qualified medical care personnel and resources." It was also the consensus of the panel that no new residents should be subjected to these inadequate conditions and services. The panel also felt that no new residents be admitted

8. Defendants' reply to plaintiffs' motion for entry of order to show cause why expert witnesses should not be appointed, mailed for filing February 2, 1976.

9. Panel Report I, p. 30.

to Menard until the basic deficiencies were corrected. Despite their recommendations, the panel noted in their second report that the increased population to 2,600 had nullified the progress to correct those problems.[10]

115. Director Rowe accepts the panel's assessment of the staffing levels and services that are needed. He also concedes the extreme difficulty of adequately staffing the institution for medical services. This problem is enhanced by the additional 600 inmates added to Menard since the panel's initial report.

116. In spite of their own long history of failure and the panel's conclusions which finds support in the record, the defendants are unwilling to reduce the population or increase personnel and care to a level at which adequate services can be provided. Efforts by the Department of Corrections to recruit and retain physicians and ancillary personnel has to date been unsuccessful. The overcrowded cells also are a health hazard. The Court, therefore, concludes the population of 2,650 must also be reduced to a level in which adequate medical services can be rendered, or a proper system of medical care be provided to adequately cover this increased population.

### Conclusions of Law

1. The trial court record herein shows that the named defendants have repeatedly been informed of gross deficiencies in the health care system and of environmental conditions and practices which impair the physical and mental well-being of the plaintiffs. The system and conditions were below constitutional standards during the entire pendency of the suit and the medical panel's second report establishes that they remained inadequate at the time of trial. The defendants are consequently liable for the continued knowing maintenance of substandard health care services.

2. The record shows that despite repeated notices of deficiencies, defendants have failed to remedy problems which exist

in the physical plant. This lack of official responsibility has resulted in an environment which aggravates existing health problems, increases the demand for the limited health care services and fosters the outbreak of disease. These conditions, therefore, lead to unnecessary suffering and are inconsistent with the dictates of the Eighth and Fourteenth Amendments.

3. Improper food storage, inadequate dishwashers, untrained personnel, the failure to provide a special diet for those who need it, open garbage tins and leaking water lines lead to the inevitable conclusion that lack of sanitation in food services presents an imminent danger to the health of each and every inmate. *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977) and cases cited therein.

4. The record shows that control cells have been used inappropriately by defendants causing serious harm to members of the plaintiff class during the entire period of the cells' use. The defendants' indifference is also apparent through a review of the Court's record.

5. Health care admission screening procedures, including a physical examination performed by a physician, are an essential element of a constitutionally adequate system; the systemic absence of complete routine physical examinations, blood test, syphilis tests and other ordinary preventative medical measures can endanger the entire prison community. *Laaman v. Helgemoe*, *supra* at 312 (D.New Hampshire 1977) and cases cited therein. The Court finds from an examination of the record that such initial screening was not consistently and promptly conducted at Menard during the course of most of this litigation. The record shows that this system is so inadequate suffering must result.

6. The Court finds that the staff shortages in both ancillary and medical personnel render the medical services below the constitutional level due under the Eighth Amendment because of the lack of medical coverage or by the use of unqualified staff

---

**10.** Panel Report II, p. 12.

members. Despite the increase of staff during the litigation, the additional growth of the prison population has rendered some improvements ineffective. The Court recognizes that the need for a sufficient medical staff coverage is not merely a desired circumstance—but rather a constitutional right.

7. The plaintiffs have demonstrated numerous instances where substandard care was received by individual inmates. The cases reviewed span a period from 1974 through the time of the trial in September 1977, and demonstrates a pattern of inadequate care at Menard. The panel's review of records noted numerous instances of substandard care and at trial, the panel members indicated that the individual cases they discussed were not isolated instances, but rather representative examples of the inadequacies in medical care they found at Menard. These examples of inmates who have suffered needlessly as a result of the lack of medical care provided by defendants, demonstrate that constitutional standards are not being met at Menard.

8. The Court finds that the defendants have recklessly failed in their duties to design and implement a mental health care delivery system which is capable of providing minimally required levels of adequate mental health care. As a direct and proximate result of this failure, the plaintiff class has been and is presently subjected to unnecessary suffering. This conduct on the part of defendants constitutes deliberate indifference to legitimate and significant health care needs of the men confined at Menard.

9. The Court also finds the evidence establishes that the budgetary process has been chaotic, irrational and the product of gross mismanagement on the part of administrative defendants at both the institutional and departmental levels. Adequate budgetary support for health care services is critical. There is no evidence of legislative insensitivity or lack of responsiveness. Defendants have repeatedly testified that there were no limitations placed on the Department by either Legislature or the Governor in terms of seeking funding for medical services. Defendants have recklessly failed to secure adequate finances for their health system. Such conduct constitutes "deliberate indifferences" to the serious medical needs of the plaintiffs.

10. Administrative defendants have failed to take reasonable action within a reasonable time frame to correct the inadequacies in the delivery of health care services. This Court is convinced that absent the prosecution of this lawsuit and the consequential input of the medical panel even the limited improvements noted by the Court's experts on reinspection, would not have been made.

11. The Court has extensively reviewed and set forth the gross inadequacies in staffing, facilities and procedures which it found to exist in relation to the health care needs of persons confined at Menard. Based on the totality of the evidence, the Court finds that these inadequacies result in a health care delivery system so wholly inadequate as to lead to unnecessary suffering to the plaintiff class.

12. The Court specifically finds that the defendants have violated the plaintiffs' rights under the Eighth and Fourteenth Amendments of the United States Constitution.

13. The Court further finds that the deficiencies in the system itself are the result of misadministration on the part of defendant-administrators that is so gross, it must be deemed willful.

14. Finally, this Court also has jurisdiction over the pendent claims for relief based on state law in this case. It has been determined from examination of the record and the totality of the facts that defendants have also violated their own Administrative Rule 836 to provide medical services of a level and quality commensurate with good medical practice.

15. In order for the Court to properly dispose of this action, a remedy must be fashioned which will eliminate all unconstitutional violations and guarantee that minimum standards are met. Close supervision

and interpretation of this remedial order may be necessary. In order to assist the Court in this complex plan, and due to the exceptional circumstances shown, a Master will be appointed under Rule 53 of the Federal Rules of Civil Procedure. While the Court does not, nor in fact, could not, delegate its full judicial responsibility and authority to a Master, such an appointment can relieve the Court of unnecessary judicial attention, thereby assuring there is sufficient review of the defendants' progress. The Court views this appointment as appropriate in light of Rule 53, and, in fact, essential to guarantee that minimal constitutional standards in medical services at Menard are safeguarded. *See, Palmigiano v. Garrahy,* 443 F.Supp. 956, 986 (D.R.I. 1977).

Therefore, pursuant to the findings of fact and conclusions of law, made and entered in the opinion of this Court, IT IS ORDERED, ADJUDGED AND DECREED that the defendants, their agents, successors in office and all persons acting in concert or participation with them, be and they are hereby enjoined:

1. From refusing or failing to provide minimum health care services as required by the United States Constitution, including the administration and delivery thereof, to the plaintiff class at Menard.

2. It is therefore ordered that the defendants submit to this Court within sixty (60) days from entry of this order, a detailed plan on how defendants will bring the health care delivery system at Menard in compliance with minimum constitutional levels of care. This plan will be implemented in order that the defendants avoid further unconstitutional deficiencies enjoined by this Court. Such a plan shall include, but is not limited to:

A. Development of an adequate health care system.

1. Establishment of a Chief of Medical Services for the Department who shall be a physician licensed in the State of Illinois. This office shall be responsible for the overall direction and administration of medical and mental health services in the Department; he should have direct line authority within the Department and as such be responsible for development and presentation of the budgets for medical services at Menard and throughout the Department; be responsible directly to the Director of the Department and shall have adequate budget and staff to carry out these responsibilities.

2. Employment of a physician licensed in Illinois as Chief Medical Officer at Menard with responsibility for direction and implementation of medical and mental health services at the institution.

3. A prompt medical examination and medical history performed by a physician within seven (7) days after an inmate's commitment to the custody of the Department. Said examination and history shall be directed to the discovery of physical or mental illness; the segregation of prisoners suspected of infections or contagious conditions; the noting of any recommendation for treatment of physical or mental defects which create special problems for the prisoner and a plan to implement only necessary treatment.

4. Medical services performed and medication dispensed solely by a medical staff with appropriate training and license and under the supervision of a licensed physician. The number of the staff shall be adequate to properly administer these services and medication.

5. A sick call procedure utilizing persons trained in physical diagnosis and triage and written procedures and protocols; a record of all medical requests shall be maintained and these records and the procedures shall be monitored and reviewed by the Chief Medical Officer to insure the adequacy of the sick call procedure.

6. The prescription, dispensing and administration of all medication under medical supervision.

7. Laboratory and x-ray services that meet minimum standards for quality

and timeliness as determined by the Chief Medical Officer; quality controls and accurate record-keeping services shall be instituted and maintained in these areas and shall be monitored and reviewed by the Chief Medical Officer to insure that the minimum standards are being met by these services.

8. Complete and accurate records documenting all medical examinations, medical findings and medical treatment developed and maintained pursuant to accepted professional standards; the Chief Medical Officer shall periodically review records to determine compliance; a trained staff shall be employed to provide adequate record-keeping services at Menard.

9. Emergency medical care on a twenty-four hour basis, seven days per week, including:

(a) Sufficient numbers of personnel with advanced training in emergency services to respond to the number and severity of medical emergencies existing at Menard;

(b) Written emergency procedures to be utilized in such instances, including provision for contacting physicians and transferring to a hospital when necessary within acceptable time limits;

(c) Equipment to be used in medical emergencies that is adequate to meet the needs of the population and is maintained and serviced at regular intervals;

(d) Cost study shall be made for the possible purchase of an ambulance or mobile intensive care unit to be available at the institution for use in emergencies.

10. Appropriate and effective in-service training programs for all medical personnel to provide demonstrated competency and documentation of qualification to perform required tasks.

11. Regularly scheduled clinical visits to review the status of chronically ill inmates, including asthmatics, diabetics, epileptics, hypertensives and cardiac patients and programs of patient teaching in these areas.

12. A system for monitoring of inpatients in the medical unit, including a call light system and trained personnel on floors where inpatients are kept; removal of inmate assistants from any responsibilities in this area.

13. Provision for the performance of both internal and external audits of medical services at Menard according to acceptable professional standards on a regular basis; a peer review of all medical personnel by the Chief Medical Officer at Menard and the Office of Chief of Medical Services on a regular and periodic basis; external audits shall be performed by personnel not employed by the State of Illinois, the Department of Corrections or the Department of Public Health; these audits and reviews shall be for the purpose of ensuring that the standards required by this Court's order are being met and that adequate medical care is being provided to all inmates.

B. The Department and the Chief of Medical Services shall promulgate, implement and review written regulations detailing the procedures and services provided by the Medical Unit at Menard subject to the approval of this Court.

C. Defendants shall provide an adequate number of mental health professionals to diagnose, treat and care for those prisoners who have mental health problems, inmates requiring evaluation shall be promptly referred to this staff; suicidal inmates shall be referred on an emergency basis and kept under observation in suitable conditions.

1. Mental health services shall be part of the medical services organization and under the supervision of the Chief Medical Officer.

2. Sufficient numbers of full-time psychiatrists and clinical psychologists shall be employed to provide adequate screening of new admissions, be available for emergency intervention, and conduct and supervise ongoing counsel-

ling and therapy for the needs of the Menard population.

3. Sufficient numbers of ancillary staff, including trained counselors, emergency hospital, personnel and psychiatric nurses shall be employed to implement programs and treatment prescribed by the psychiatrists and psychologists.

4. The use and dosages of psychotropic drugs shall be reviewed within thirty (30) days of the entry of an order by a psychiatrist with experience in a correctional setting.

D. Menard shall satisfy at least the following minimum condition:

1. Defendants shall provide each prisoner with appropriate supplies to keep his cell clean.

2. A regular and effective program of insect and rodent control shall be undertaken.

3. All trash and debris shall be regularly removed from hallways, cellblocks, corridors and other common areas and trash, debris and used mattresses shall in no circumstances be stored or accumulated in vacant cells.

4. Each cell, whether in segregation, reception and classification, or general population units, shall be equipped with a working toilet which can be flushed from inside the cell, a sink with hot and cold running water, personal storage units and refuse containers made of noncombustible materials, a clean mattress, clean bed linens changed weekly, clean blankets changed every 90 days and a bed off the floor.

E. All inmates, whether confined in segregation, or reception and classification, shall be provided adequate shower and exercise.

F. Food shall be stored, prepared and served under sanitary conditions. Equipment shall be maintained in good working order.

1. Food shall be prepared under the direction of a dietitian certified in the State of Illinois who shall plan menus and assist in food preparation, purchasing and sanitation.

2. Kitchen employees and inmates working in the food services area shall be adequately trained and supervised in the handling and preparation of food, inmates working in food services shall receive physical examinations prior to assignment to food services to determine their suitability for such work and at least annual physicals thereafter to determine continued suitability.

G. The defendants shall demonstrate to this Court that they can properly house 2,650 inmates while providing an adequate medical care system, with a sufficient number of medical personnel. The defendants must also show that all above guidelines have been followed in making this demonstration to the Court. If the defendants cannot sustain this burden, they must then specifically designate the maximum number of residents who could be properly kept at Menard. The Court specifically reserves the right to reduce the population to a level it feels appropriate in light of all evidence in the record.

In order to aid in the development and implementation of this plan, a Master will be appointed pursuant to Rule 53 to assist the Court. Both parties shall submit names and resumes of possible masters within twenty (20) days in order that the Court may select a qualified neutral party to become the Master. The Master should be a physician with experience in the design and delivery of health care services in a correctional setting.

The Master shall be empowered to monitor compliance with and implementation of the relief ordered herein. The Master shall also advise and assist the Court to the fullest extent possible. The Master will report to the Court on a monthly basis on the progress of such compliance and implementation, and make findings and recommendations concerning compliance with relief ordered as well as the necessity for further relief in this case. In order to carry out his duties the Master shall have the following power and authority:

1. The Master or his delegates shall have unlimited access to any facilities, buildings or premises under the control of the Department of Corrections, or any records, files or papers maintained by said Department. Access shall be granted at any time and no advance notice shall be necessary.

2. The Master is authorized to conduct confidential interviews at any time, without advance notice, with any staff employee of the Department or any prisoner. The Master or his delegate may attend any institutional meetings or proceedings.

3. The Master may require written reports from any staff members or employees of the Department of Corrections with respect to compliance with and implementation of this Court's orders.

4. In the event that hiring of additional personnel or the termination of any current personnel is necessary to carry out or to prevent interference with the Court's order, the Master shall file a written report with the Court explaining why such action is necessary. Defendants may file a written response to the report and the Court shall approve or reject the recommendation of the Master.

5. The Master is authorized to select and hire with the prior approval of the Court, a full-time staff consultant if such person is needed to assist him in carrying out his duties and one full-time clerk-stenographer, if needed. Adequate offices, equipment and supplies shall be made available by the defendants. The Master may also consult appropriate independent specialists.

6. Necessary expenses for carrying out the Master's duties shall be paid pursuant to Rule 53, Federal Rules of Civil Procedure, and shall be taxed as part of the costs of this case against the defendants in their official capacities.

It is further ordered that the defendants shall, within six (6) months from the date of this order, submit a comprehensive report setting forth their progress in implementation of each and every element of relief in this order, with a timetable for full compliance. Copies of this report shall be provided to plaintiffs' counsel.

Plaintiffs will submit to the Court within thirty (30) days briefs detailing the applicability of 42 U.S.C. § 1988, which allows reasonable attorney fees and costs to this action. The plaintiffs will also provide justification for all costs and expenses incurred in the prosecution of this action. Plaintiffs will also specify the method used in computing reasonable attorney fees. Defendants may respond on any aspect of this issue within sixty (60) days of this order.

Finally, the Court specifically retains jurisdiction of this cause for purpose of enforcing this order and for entering any and all additional orders deemed necessary to implement the effect and intent of this decree.

IT IS SO ORDERED.