Ralph **LIGHTFOOT** and LaCarttle Jones, Plaintiffs,

v.

Daniel **WALKER**, Individually & as Governor of State of Illinois, Allyn R. Sielaff, et al., Defendants.

Civ. Nos. 73–238E, 78–2095.

United States District Court, S.D. Illinois, East St. Louis Division.

Oct. 18, 1985.

---

**5.** Defendants' requests for sanctions, attorney's fees and cost will be addressed in a separate order.

Herbert A. Eastman, Chackes & Hoare,
St. Louis, Mo., Harvey Grossman, Chicago,

Ill., Patrick Flynn, Columbia, S.C., for plaintiffs.

Patricia Bornor, Chief Legal Counsel, State of Ill., Dept. of Corrections, Pat Chapin, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

Plaintiffs' application for attorney's fees and costs, pursuant to 42 U.S.C. § 1988, is now before the Court.

## I. UNDERLYING LITIGATION

Plaintiffs originally filed this 42 U.S.C. § 1983 action on October 2, 1973 on behalf of thirty-eight named black prisoners confined to segregation at Menard Correctional Center (Menard) since May 1, 1973. Among other things, the plaintiffs challenged the adequacy of health care provided in segregation. On December 4, 1973, the parties consented to a temporary restraining order providing in part for regular exercise and proper health care. On July 14, 1975, the plaintiffs amended their complaint, to include all inmates in segregation. This amended complaint alleged violations of both federal constitutional and state law in a number of areas of institutional life including a claim that there existed at Menard a systematic denial of adequate health care services. The Court certified this class on March 5, 1976.

Upon the plaintiffs' motion, and over the defendants' strong objection, the Court appointed a panel of impartial medical experts pursuant to Fed.R.Evid. 706. This panel was instructed to assist the Court in determining questions of essential medical care as required by the United States Constitution and to direct and conduct a comprehensive health services survey to determine the adequacy and propriety of health care services provided by the defendants. On November 18, 1976 the panel filed its first report, stating that, in its opinion, there was a systematic denial of acceptable medical care to all residents at Menard, and not just the certified class.

In light of this conclusion, the Court granted the plaintiffs' motion to expand the class to all the inmates incarcerated at Menard for purposes of declaratory and injunctive relief as to the issues involving denials of medical care. A non-jury trial of these health care issues commenced on August 29, 1977, and continued for thirty-one bitterly-fought days, ending on November 17, 1977. During this trial, the medical panel reinspected the prison pursuant to the request of the defendants. After the conclusion of the trial, the Court allowed the plaintiffs and defendants to submit proposed findings of fact and conclusions of law. Almost two years later, after this briefing was complete, the Court heard oral argument on the matter. The Court issued its order, as amended, on March 18, 1980. See *Lightfoot v. Walker,* 486 F.Supp. 504 (S.D.Ill.1980).

After a careful examination of all the voluminous exhibits, briefs, memorandums, and evidence, the Court found gross deficiencies in the health care system and environmental conditions which amounted to a violation of the plaintiffs' eighth amendment rights. *Id.* at 525. The Court ordered extensive and detailed relief including the creation of a state-wide office of medical services within the Department of Corrections. The Court approved the appointment of a special master to oversee the implementation of the relief ordered. In November of 1984, the Court, having found that the defendants were in substantial compliance with the requirements of the order, dismissed the Master.

On October 9, 1981, the plaintiffs submitted an application for costs, expenses, and attorney's fees. The defendants responded to the application and requested that a hearing be held on the matter. The plaintiffs maintained that a hearing was not necessary. The Court accommodated the defendants, and an evidentiary trial hearing was held for seven days in November and December of 1984. Oral argument on the matter was heard on July 26, 1985.

The plaintiffs request that the Court award them $605,243.00 for attorney's fees, a twenty-five percent enhancement, and $26,303.65 in costs and expenses.

## II. LEGAL STANDARDS

42 U.S.C. § 1988 provides that in a federal civil rights action such as this, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." In calculating a reasonable attorney's fee, the Court must make an initial estimate, commonly referred to as the "lodestar" figure, by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Adjustments to this figure may be made as necessary in the particular case. *Blum v. Stenson,* 465 U.S. 886, ——, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984).

The Supreme Court advises, although not heeded here, that a request for attorney's fees should not result in a second major litigation. *Hensley,* 424 U.S. at 437, 103 S.Ct. at 1941. The "fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* The applicant is expected to exercise billing judgment with respect to the hours claimed and should maintain accurate time records. *Id.*

Before applying the legal standards to the case at hand, the Court feels obligated to address at this time two points of major significance. First, the Court notes that a major portion of the findings the Court makes below are based on this Court's extensive involvement with this case. This Court has superintended this case from the initial filing of the original complaint in 1973 through this fee request. The Court was present at numerous pretrial conferences and meetings. The Court ruled on the hundreds of pretrial motions filed. The Court presided over the thirty days of trial. The Court painstakingly plowed through the hundreds, if not thousands of pages of briefs, reports, and exhibits in this case. The Court wrote the fifty or so pages of findings and conclusions granting the plaintiffs the relief they requested. Finally, since that order, the Court has monitored the compliance stage of this litigation. The Court only mentions this fact to assure the parties that a majority of the evidence presented during the seven days of fee petition hearing served only to jar this Court's memory as to the specifics of the underlying litigation.

■ With this fact in mind, the Court turns to the second point. As a defense to a majority of the fee request, the defendants have tendered to the Court the recent Supreme Court case of *Marek v. Chesny,* —— U.S. ——, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). In *Marek,* the Supreme Court held that a prevailing plaintiff for purposes of § 1988 is not entitled to any attorney's fees incurred after a valid Fed.R.Civ.P. 68 offer of settlement has been made. Fed.R.Civ.P. 68 provides that if a timely pretrial offer of settlement is not accepted, and the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after making the offer. Since § 1988 includes attorney's fees as part of costs, the Supreme Court reasoned that in civil rights actions the term costs in Rule 68 includes attorney's fees. *Id.* 105 S.Ct. at 3017. Therefore, if the final judgment is not more favorable than the offer, the offeree, although a prevailing party, may only recover its attorney's fees incurred prior to the offer.

While this Court openly embraces the *Marek* decision in light of the low likelihood of settlement in civil rights actions, it is not applicable to the case at hand for the simple reason that the judgment obtained was far more favorable than any offer of settlement. The defendants contend that a careful comparison of the final order with their offers of settlement reveals that mathematical precision exists. Notwithstanding the fact that there is inherent difficulty in comparing settlement proposals in cases such as this, the Court feels obligated to briefly specify the inadequacies of the defendants' offers since they have devoted a great deal of time to this defense.

The final order in the underlying case required the defendants to submit a detailed compliance plan demonstrating the manner in which they would provide an

adequate health care delivery system. The defendants never offered such a plan. The Court ordered the creation of a departmental Chief of Medical Services. The defendants never offered one. The Court ordered an adequate budget for the delivery of the health care systems. The defendants' offers never came close to being adequate. The Court ordered the employment of a physician as Chief Medical Officer. The defendants offered such a position but burdened the position with numerous other responsibilities. The Court appointed a master to oversee compliance. The defendants never considered this. The Court deemed all of these above provisions absolutely *essential* for the delivery of any meaningful health care system, and none of them were offered by the defendants. Further, with respect to specifics, the Court required that a medical exam and history be taken of each inmate within seven days of their arrival at Menard. The defendants never offered this. The Court ordered a comprehensive system of record-keeping and supervision. The defendants' offer to provide a nurse to assume these responsibilities was severely lacking. The Court could go on and on in describing the inadequacies of the defendants' offers. Suffice to say, with regard to the specifics, the Court ordered a systematic delivery of health care, but the defendants only offered a few of the "nuts and bolts" asking the plaintiffs to place their trust in the expertise of the defendants, who even after the second medical panel report, failed to rectify gross deficiencies in the delivery of medical care.

The plaintiffs have characterized this defense as "transcending advocacy and entering the Land of Oz." While not commenting on the accuracy of this characterization, the Court need only to remind the parties that it was privy to many, if not all, the settlement offers. Its ironic to note that the inherent suggestion made by the defendants' argument is that this Court stood by and let such wonderful offers fall by the wayside without exerting that remarkable power of persuasion that a district judge possesses. To be sure, had this Court thought the defendants' proposals to be reasonable, that belief would have readily been communicated to the plaintiffs, especially in light of the thirty days of trial this Court faced. For these reasons the Court believes that *Marek* is inapplicable to this case.

## A. PREVAILING PARTY.

■ A plaintiff must be a "prevailing party" to recover attorneys fees under § 1988. Plaintiffs will be considered prevailing parties if they succeed on any significant issue in litigation which achieves some of the benefit the plaintiffs sought in bringing this suit. *Hensley,* 461 U.S.·at 433, 103 S.Ct. at 1939. Here, the Court finds that the plaintiffs have prevailed in this action. In fact, it would be difficult for the Court to think of a case where the plaintiffs have more completely prevailed. The plaintiffs were granted much, if not all, the relief they requested. The Court finds no special circumstances which would render an award of attorney's fees here unjust as that term is used in *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).

## B. LODESTAR FIGURE.

■ As stated earlier, the Court's initial determination is to calculate the lodestar figure. This is accomplished by multiplying the number of hours reasonably expended by a reasonable hourly rate. In determining this figure, the Court should consider twelve factors, labeled the *Johnson* factors. See *Hensley,* 461 U.S. at 429–30, 103 S.Ct. at 1937; *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). These factors are:

1. the time and labor required;
2. the novelty and difficulty of the questions;
3. the skill requisite to perform the legal service properly;
4. the preclusion of employment by the attorney due to acceptance of this case;
5. the customary fee;

6. whether the fee is fixed or contingent;

7. time limitations imposed by the client or the circumstances;

8. the amount involved and the results obtained;

9. the experience, reputation, and ability of the attorneys;

10. the "undesirability" of the case;

11. the nature and length of the professional relationship with the client; and

12. awards in similar cases.

*Hensley,* 461 U.S. at 430 n. 3, 103 S.Ct. at 1937 n. 3.

### 1. *Documentation.*

[7] The plaintiffs claim attorney's fees for 3,070.5 hours expended by Mr. Grossman spanning the period from September of 1973 through August of 1981, and 2,966.3 hours expended by Mr. Flynn, spanning the period from February of 1975 through July of 1978. They have supported a majority of this time with contemporaneous time records. The remainder of the time they have reconstructed from reviewing their work-product or their files. It is the Court's opinion that this reconstruction was done conservatively, with a great deal of time greatly understated or totally excluded. The Court bases this evaluation in part on an examination of the underlying work-product submitted to the Court, and in part on the attorneys' testimony to this effect.

The documentation in support of this petition, while not perfect, was abundantly adequate, especially in light of the fact that these attorneys, as public interest attorneys, were not in the habit of documenting each minute of their day so as to accurately bill their clients.

### 2. *Reasonableness of hours expended.*

Applying the *Johnson* factors that are applicable to this aspect of the lodestar figure, the Court finds the total hours claimed by attorneys Grossman and Flynn reasonable under the circumstances.

■ In order to avoid encouraging overpreparation, the Court should consider reasonable only the hours ordinarily necessary competently to prepare comparable cases. *Bonner v. Coughlin,* 657 F.2d 931 (7th Cir.1981). In this regard, the Court finds the testimony of the plaintiffs' expert, Mr. Bronstein, very helpful. Mr. Bronstein has been recognized as a national expert, if not the foremost authority, in prison and civil rights litigation. His career in this area of law spans many decades and encompasses prison reform. He has argued complex prison issues before the United States Supreme Court on several occasions, has served on various panels advising courts on these issues, and has written extensively on prison issues. He currently serves as executive director of the National Prison Project. In his opinion, the time expended on this case was reasonable in light of the complexity of the issues, the type of plaintiffs represented, and his knowledge of similar cases. The Court agrees.

■ The case was one of the first of its kind in the country. The plaintiffs' attorneys were faced with novel and difficult factual and legal issues. It was not until three years into this litigation that the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), defined the deliberate indifference standard to be applied in such a case. It was still up to plaintiffs' attorneys to take this abstract legal standard and apply it to reality and shape their case around it. These attorneys had to prove their case for the most part through the mouths of the defendants' medical staff. This required massive discovery, which included the sifting through of thousands of pages of medical documents. Unlike a normal medical malpractice case, the plaintiff faced the almost insurmountable standard of deliberate indifference, and had to acquire not only the expertise to understand individual medical problems but *systematic* deficiencies. Rarely, if ever, does a medical malpractice attorney have to prove a systematic failure. These attorneys had to understand, organize, and then present these complex legal and factual issues to this

Court in a way that would allow the Court to make a rational decision.

Throughout this whole process, the plaintiffs were strenuously fought every step of the way. The plaintiffs were forced to file numerous motions to compel to acquire essential discovery materials. After this came the defendants' motions to dismiss, motions for summary judgment, endless requests for continuances, and an interlocutory appeal. The defendants ignored the first panel report, asked for a second, and then ignored it. At trial, the defendants entered into *no* stipulations of fact. Trial of this matter was one of the most bitterly fought battles this Court has ever encountered, surpassed only by the trial of this fee petition.

The defendants contend that once the medical panel issued their report, the plaintiffs had the case won, and that the plaintiffs overkilled from there. However, if the defendants believed that this report was that influential, they surely did not reflect this in their trial tactics. Believing that the conditions had improved at Menard, they asked for a second report, and at trial present six expert witnesses to refute the plaintiffs' claims. It amazes this Court to hear the defendants now argue that so much of this time was unnecessary when so much of this time was caused *directly* by the defendants.

In summary, the Court finds the time claimed for Mr. Grossman and Mr. Flynn to be reasonable under the circumstances. The Court further finds there to be no duplication of effort involved. A final point bearing on the reasonableness of the hours expended is that the plaintiffs are not claiming a fee for the hours worked on this case by attorneys Kennedy, Bastian, Seng, Eastman, Stapleton, or Johnson.

### 3. *Reasonableness of the hourly rates.*

■ The reasonable rate under § 1988 is to be calculated according to the prevailing market rates in the relevant community for similar services by lawyers of reasonable comparable skill, experience, and reputation regardless of whether the plaintiff is represented by private or non-

profit counsel. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1547 (1984). Time spent by the attorneys traveling may be compensated at the full market rate. *Henry v. Webermeier*, 738 F.2d 188 (7th Cir. 1984). In determining this rate, the Court should consider those *Johnson* factors that are applicable to this aspect of the lodestar figure.

■ Although the Supreme Court indicates that market rates are to be utilized, it has not addressed whether current market rates or historical market rates are to be used. A number of scenarios exist. The Court could award a fee based on current market rates for current experience and expertise; current market rates for experience comparable to that of the attorney performing the work at the time the work was performed; historic rates for current experience; or historic rates for experience comparable to that of the attorney performing the work at the time the work was performed. The Seventh Circuit has seemingly approved the use of a current hourly rate but has not indicated which of the first two scenarios is preferred. *Gautreaux v. Chicago Housing Authority*, 690 F.2d 601, 612 (7th Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). The Tenth Circuit in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), has likewise indicated that "[t]he hourly rate at which compensation is awarded should reflect rates in effect at the time the fee is being established by the Court, rather than those in effect at the time the services were performed." *Id.* at 555. On remand, the defendants in *Ramos* argued that this should be interpreted to mean the second scenario above. The district court disagreed, opting to interpret the Tenth Circuit's language so as to fall into the first scenario. *Ramos v. Lamm*, No. 77–K–1093, slip op. at 3 (D.Colo. June 3, 1985).

While at least one circuit court disagrees, see *New York Ass'n For Retarded Children v. Carey*, 711 F.2d 1136, 1153 (2d Cir.1983) (historic rates), this Court believes that the approach taken by the *Ramos* courts is the better approach since it

accounts for both inflation and interest and in so doing compensates for the contingency fee factor mentioned in *Johnson.* As Justice Brennan has noted:

> Most attorneys paid an hourly rate expect to be paid promptly and without regard to success or failure. Customary rates reflect those expectations. Attorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally received far more in winning cases than they would if they charged an hourly rate. The difference, however, reflects the time value of money and the risk of non-recovery usually borne by clients in cases where lawyers are paid an hourly rate. Courts applying § 1988 must also take account of the time-value of money and the fact that attorneys can never be 100% certain that they will win even the best case.

*Hensley v. Eckerhart,* 461 U.S. 424, 448–49, 103 S.Ct. 1933, 1947–48, 76 L.Ed.2d 40 (1983) (Brennan, J., concurring in part and dissenting in part).

The Court recognizes that in a case such as this, which spans over a number of years, attorneys with little or no experience when they started on the case will be compensated at their present rates for present experience. While such a result may at first blush appear unfair, one need only take historic rates for historic experience and account for the value of inflation and interest to realize that in present times the simplified approach this Court advocates falls on the conservative side.

 With the above in mind, and after considering the appropriate *Johnson* factors, the Court feels that the $115 per hour requested for Mr. Grossman, and the $85 per hour for Mr. Flynn are reasonable hourly rates.

Based on this Court's own observations and on the testimony of Mr. Bronstein, the skill required to litigate a case such as this is extensive. As stated earlier, the attorneys were required to obtain expertise in specific medical deficiencies *and* systematic deficiencies and present it in such a way that the Court, who lacked such expertise, would be able to understand and rule accordingly. The Land of Lincoln Legal Assistance Foundation devoted a great deal of time, energy, manpower, and resources to this lawsuit, with the result being that other low-income clients were denied services. Given the state of the law at that time, the stiff legal standard, and the magnitude of the relief sought, the likelihood of success was low. This fact, taken in conjunction with the fact that the plaintiffs were inmates and that when this case was filed there existed no statutory authorization for attorney's fees, made this case very undesirable.

These attorneys overcame all these barriers and obtained substantial relief. Due to their hard work, dedication, and expertise, a grossly deficient medical system was totally revamped to such an extent that it now serves as a model for prison health care. The 2600 inmates then, and every Menard inmate since, has greatly benefited from this revamping. Further, the relief obtained in this case, by its nature, directly affected the entire Illinois prison system. For example, the Court ordered the employment of a doctor to serve as Chief of Medical Services with direct line authority on a state-wide basis. The bottom line is that due to their efforts gross medical deficiencies no longer served as the mode for prison punishment.

The Court cannot say enough about the quality of the representation. Aside from Mr. Grossman's excellent reputation as a civil rights attorney and his extensive experience in complex civil rights matters, this Court can think of few attorneys who have passed through its courthouse doors who possess the integrity, discipline, organization, and all around litigation ability of Mr. Grossman. Although a young attorney when this case first began, any experience he lacked was more than compensated for by his thorough preparation. The $115 fee request for him is reasonable whether this Court views the relevant market as the Southern District or the entire nation. Mr. Bauman, the defendants' expert, testified that he receives a comparable rate in the

Southern District in certain defense cases. Mr. Bronstein testified that, in his opinion, Mr. Grossman could command between $115 and $125 for combined in court and out of court time. Mr. Grossman has been awarded a comparable rate in other cases. Taking into consideration all of these factors, the Court feels that $115 rate for Mr. Grossman is a reasonable combined rate for work both in and out of court.

Likewise, the Court believes the $85 rate for Mr. Flynn to be a reasonable combined rate in both this district and the nation. Although Mr. Flynn does not possess the same experience of Mr. Grossman, he does have extensive experience in civil rights cases. While Mr. Grossman handled most of the in-court work, when called upon, Mr. Flynn did a solid and commendable job.

In conclusion, the Court finds the 3,070.5 hours for Mr. Grossman at $115 per hour, and the 2,966.3 hours for Mr. Flynn at $85 per hour for a total lodestar figure of $605,243.00 to be abundantly reasonable. The Court has reviewed the fees awarded in similar cases and has found that this award to be consistent with those awards. Specifically, the Court finds the *Ramos* case to be very similar to this one, and the fee award there was approximately $1,000,-000.

## C. ADJUSTMENT.

Adjustments to this lodestar amount may be made as necessary in certain cases. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). The defendants renew their settlement argument in support of a negative adjustment. In response, the Court renews its earlier comments that the plaintiffs were totally justified in refusing every offer since the offers were unreasonable.

The plaintiffs request of 25% upward adjustment. They contend that the exceptional success they achieved combined with the risk of non-payment warrants such an enhancement. The Court disagrees. Only when the lodestar figure fails to adequately compensate the plaintiffs will an enhancement be justified. *Blum,* 104 S.Ct. at 1550. In determining

whether or not an enhancement is justified the Court must not consider those factors which it considered in arriving at the lodestar figure. Here, in setting the lodestar figure, the Court considered both the exceptional success achieved and the risk of non-payment. In refusing the enhancement, this Court is in no way commenting on the quality of representation or magnitude of this lawsuit. The attorneys should take great pride in their representation and the results achieved. The Court merely feels that the lodestar figure adequately compensates the plaintiffs' attorneys for the work they performed.

## D. EXPENSES AND COSTS.

The plaintiffs seek $26,303.65 in costs and expenses. The defendants have not challenged this amount, nor does the Court.

## III. CONCLUSION

Accordingly, the Court hereby awards the plaintiffs attorney's fees in the amount of $605,243.00 and expenses in the amount of $26,303.65 for a total of fees and expenses of $631,546.65. The parties are ordered to confer and propose a payment schedule for this award. This schedule should provide for post-judgment interest at the appropriate legal rate for the total award. This jointly authorized document stating agreements and disagreements shall be filed by December 1, 1985. After that submission is reviewed, this Court will enter an appropriate order and judgment in accordance with this memorandum and in light of the submissions.

IT IS SO ORDERED.