826 F.2d 516
 Ralph LIGHTFOOT, LaCarttle Jones, Fred Jenkins, and Nelson
Weaver, on behalf of themselves and all others
similarly situated, Plaintiffs-Appellees,
v.
Daniel WALKER, Governor of the State of Illinois, et al.
Defendants-Appellants.
 Nos. 86-2004, 86-2184.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 15, 1987.
Decided July 24, 1987.
As Amended Aug. 3, 1987.
 
 James Prendergast, Richard J. Prendergast, Ltd., Chicago, Ill., for defendants-appellants.
 Harvey Grossman, Roger Baldwin Foundation of ACLU, Chicago, Ill., for plaintiffs-appellees.
 Before WOOD, FLAUM, Circuit Judges, and GRANT, Senior District judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Nearly fourteen years ago, several inmates at the Menard Correctional Center (Menard) filed an individual suit against the State of Illinois,[1] under 42 U.S.C. Sec. 1983, seeking to improve conditions in segregation. Their case eventually mushroomed into a massive legal battle on behalf of all inmates at Menard, challenging conditions prison-wide as unconstitutional. After thirty-one days of trial, the district court found the substandard conditions violated the eighth and fourteenth amendments and, in February 1980, ordered extensive relief. Lightfoot v. Walker, 486 F.Supp. 504 (S.D.Ill.1980) (Lightfoot I ). By November 1984, the state had substantially complied with the remedial order. In the meantime, the inmates' attorneys, Harvey Grossman and Patrick Flynn, had petitioned for attorney's fees under 42 U.S.C. Sec. 1988. The issue of fees was hard-fought, and following seven days of trial in late 1984, the district court awarded $605,243.00 in fees to Grossman and Flynn. Lightfoot v. Walker, 619 F.Supp. 1481 (S.D.Ill.1985) (Lightfoot II ). The court subsequently awarded the inmates' attorneys an additional $60,120.50 in fees for their work in litigating the issue of fees. The state challenges the entire fee award, which now totals $710,501.10, as unreasonable. The state also requests us to reconsider our decision in Lightfoot v. Walker, 797 F.2d 505 (7th Cir.1986) (Lightfoot III ), in which we affirmed the district court's refusal to grant an unsecured stay pending this appeal.
 
 I. BACKGROUND
 
 2
 The state claims that the underlying litigation was merely a "routine legal matter" that the plaintiffs' attorneys prolonged unnecessarily and unreasonably. See Argument of Patricia Chapin, Report of Proceedings at 54 (July 26, 1985). The district court, on the other hand, characterized this litigation as extremely complex and observed that no ground had been surrendered without a struggle. We therefore provide the following summary of that litigation in order to demonstrate the artificiality of the state's claim. See also Lightfoot I.
 
 
 3
 On October 2, 1973, public interest attorneys from the Land of Lincoln Legal Assistance Foundation filed an individual action on behalf of 38 black inmates confined to segregation at Menard, challenging the constitutionality of their conditions of confinement. These inmates were living in overcrowded cells and were surrounded by open sewers, standing water, flies, roaches, dried food, dirt and decaying garbage. They had no hot water for their once-a-week showers and some were deprived of exercise for months at a time. As the attorneys began to discover the extent of these disturbing conditions, they moved for the appointment of an independent medical panel to inspect the prison. In addition, they sought to amend the complaint to include as plaintiffs all inmates in segregation. The state resisted the plaintiffs' efforts in both regards, but in March 1976, the court granted the two motions.
 
 
 4
 Over the next six months, the medical panel inspected the prison, reviewed voluminous medical records and interviewed numerous staff members and inmates. On November 18, 1976, the panel issued its first report, revealing that unsafe and unsanitary conditions existed prisonwide. Problems ranged from improperly sterilized instruments in the medical unit to health-threatening plumbing in the food service area to improper treatment by untrained medical technicians resulting in unnecessary deaths. The panel report concluded that all prisoners were being denied even minimally adequate health care at Menard. As a result, the plaintiffs moved for, and were granted, certification of the entire prison population of over 2,600 as a class in December 1976.
 
 
 5
 Along with its findings, the panel also made specific recommendations for remedying the deficiencies. Although the state was not quick to implement the panel's sound recommendations, the report apparently prompted the state to initiate settlement talks. The talks, however, were fruitless. The state never offered a comprehensive plan for remedying the deficiencies, instead making only "piecemeal" proposals. See, e.g., Discussion between Court and Patricia Chapin, Report of Proceedings at 39-40 (July 26, 1985). The state did not rely upon the advice of any doctors in formulating its proposals, see Testimony of Fred Montgomery, Report of Proceedings at 138-40 (Dec. 13, 1984), and the proposals therefore reflected a lack of understanding regarding the extent of the prison's massive deficiencies. Moreover, the state refused to admit to its constitutional violations despite the growing reality to the outside world of the frightening conditions that existed within the prison's walls. As a result of these inadequacies, settlement was never reached.
 
 
 6
 The state's failure to offer an acceptable settlement required the continual updating of discovery since it became clear that at trial the plaintiffs would be required to prove ongoing constitutional violations with timely facts. Thirty-one days of trial began in August 1977. Although the state had consistently tried to thwart their discovery attempts and had refused to even commit to the findings of the panel, the plaintiffs were able to prove at trial that, for instance, there was no hot water until 1977; extremely poor sanitation still existed in segregation; housekeeping in the medical unit remained unacceptable (e.g., clean and soiled linen stored together, improperly sterilized instruments, no ventilation in isolation rooms); the food services area was still a health hazard (e.g., insects and rodent droppings in the bakery area, no fire extinguishing equipment near the deep fat fryers or elsewhere, obnoxious odors emanating from the workers' toilet, inadequate handwashing and shower facilities for workers); the number of physicians and scheduled medical hours remained insufficient; and, preventable deaths occurred even during the trial. And the list goes on.
 
 
 7
 Despite the plaintiffs' evidence, the state was not ready to give up its fight. It attempted to show, through the testimony of six expert witnesses, that the plaintiffs' claims were largely moot. To further support its mootness argument, the state requested a second panel investigation which was conducted midway through the trial. Unfortunately, the second panel report merely bolstered the plaintiffs' case. The panel concluded that, not only had its original recommendations been largely ignored, but an increased prison population (despite its recommendation against it) had cancelled any progress that might have been made.
 
 
 8
 Trial ended in November 1977 and, in March 1980, the court entered an order finding that the conditions in the prison were so substandard as to lead to unnecessary suffering in violation of the eighth and fourteenth amendments and that these conditions existed even at the time of trial. Lightfoot I, 486 F.Supp. at 524-25. The order detailed specific, extensive relief and specified time periods for compliance. The court found that, "absent the prosecution of this lawsuit and the consequential input of the medical panel even the limited improvements noted by the Court's experts on reinspection, would not have been made." Id. at 525. The state had continued to ignore the deficiencies despite "the numerous instances where conditions and problems [had] been brought to the attention of the administration, both at the institution and at the department level." Id. at 513. The state's obvious indifference to the prisoners' unnecessary suffering led the court to appoint a master to oversee compliance with its order.
 
 
 9
 Far from cooperative even after trial, the state initially filed a mandamus action in an unsuccessful attempt to bar the newly-appointed master from entering Menard. Four and one-half years later, however, the court found that the state had substantially complied with its February 1980 order. In the meantime, the plaintiffs' attorneys who tried the case, Grossman and Flynn, had petitioned for costs, expenses and attorney's fees, under 42 U.S.C. Sec. 1988, in October 1981.
 
 
 10
 Although the plaintiffs' attorneys maintained that a hearing on the fee petition was unnecessary, the state requested one. The court set a hearing for June 6, 1984, and a month before the hearing, the state moved for a continuance. Following seven days of trial on the fee petition in November 1984, the court awarded Grossman and Flynn $605,243.00 in attorney's fees for their work in the underlying litigation. Lightfoot II.
 
 
 11
 In calculating the fee award, the court initially considered the state's argument, based upon Marek v. Chesny, 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985), that the attorneys were not entitled to fees incurred after the plaintiffs unreasonably refused to accept the state's settlement offers. Rejecting this argument, the court detailed the inadequacy of the state's offers as compared to the final relief obtained, concluding that the court had "ordered a systematic delivery of health care, but the defendants offered a few 'nuts and bolts' asking the plaintiffs to place their trust in the expertise of the defendants, who even after the second medical panel report, failed to rectify gross deficiencies in the delivery of medical care." Lightfoot II, 619 F.Supp. at 1486. The court then considered the reasonableness of the number of hours claimed and of the hourly rates requested. Given the conservative reconstruction of the time records and the novel, complex legal and factual issues in the case, the court found the number of hours petitioned for reasonable. Over the state's objection, the court awarded current as opposed to historic rates, to account for the value of inflation and interest. In addition, the court approved the hourly rates requested, finding them reasonable whether the relevant market was the Southern District of Illinois or the entire nation. Finally, the court declined to make any adjustment in the lodestar figure, finding that it adequately compensated the attorneys. On May 23, 1986, the court awarded the plaintiffs' attorneys "fees for fees" in the amount of $60,120.50. Four days later, the court entered both fee awards as final.
 
 
 12
 The state challenges the fee awards as unreasonable. Although it does not challenge any of the 899 hours the plaintiffs' attorneys claim for work prior to the first panel report,[2] it argues that their unreasonable refusal to settle should preclude them from recovering all of their fees for work after that point. Instead, the state argues, they should be paid for only 1,220 hours of work in this case since that is the number of hours attorneys in Palmigiano v. Garrahy, 466 F.Supp. 732 (D.R.I.1979), aff'd, 616 F.2d 598 (1st Cir.), cert. denied, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980), spent on that case. In addition, the state challenges the hourly rates awarded two of the attorneys and the use of current rates. Accordingly, the state requests us to modify the attorney's fee award and "enter judgment in the underlying litigation at the rate of ... $60/hour for Mr. Grossman and $50/hour for Mr. Flynn for 1,220 hours."[3] Appellants' Brief at 50.
 
 II. ATTORNEY'S FEES
 A. Standard of Review
 
 13
 The prevailing party in a federal civil rights case is entitled to an award of reasonable attorney's fees pursuant to 42 U.S.C. Sec. 1988. Here the district court found, and the state does not seriously contest, that the plaintiffs prevailed.[4] We need only review then whether the fee award is reasonable.
 
 
 14
 Our review of the fee award is very limited. Given "the district court's superior understanding of the litigation and the desirability of avoiding appellate review of what are essentially factual matters," Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), the determination of a fee award is left to the sound discretion of the district court. Id.; Spanish Action Committee of Chicago v. City of Chicago, 811 F.2d 1129, 1134 (7th Cir.1987). Accordingly, "[i]f reasonable persons could differ over the trial court's view, then the appellate court will not be able to find an abuse of discretion." Munson v. Friske, 754 F.2d 683, 696 (7th Cir.1985).
 
 
 15
 As the Supreme Court has stated, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." Hensley, 461 U.S. at 435, 103 S.Ct. at 1940. Congress intended for "plaintiffs [to] receive a reasonable fee that is 'adequate to attract competent counsel,' and that 'counsel for prevailing parties be paid, as is traditional with attorneys compensated by a fee-paying client, "for all time reasonably expended" '." Gekas v. Attorney Registration and Disciplinary Commission, 793 F.2d 846, 853 (7th Cir.1986). Such a fee award is thus arrived at by first calculating a lodestar figure--the number of hours reasonably expended multiplied by a reasonable hourly rate. The court, where warranted, may then adjust the lodestar figure upwards or downwards through the use of a multiplier.
 
 B. Reasonableness of Hours
 
 16
 Grossman and Flynn requested compensation for 6,036.8 hours for their work in the underlying litigation. The district court opinion provides a lengthy and detailed explanation for its finding reasonable all of the hours requested. Several important factors motivated the court. The court recognized that this case was one of the first of its kind in this country, thereby raising novel and complex legal and factual issues. Although the Supreme Court decided Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) three years into the Lightfoot I litigation, the district court noted the difficulty in taking an abstract and untried legal standard and molding it to fit the facts of a particular case. Moreover, the court noted that the plaintiffs were faced with massive discovery which was difficult not only because they were forced to prove their case through the "mouths of the defendants' medical staff," but because they necessarily had to gain the medical expertise to understand systematic deficiencies. To add to an already difficult and lengthy task, the state "strenuously fought" the plaintiffs every step of the way, causing the court to remark that this was "one of the most bitterly fought battles" ever before it. 619 F.Supp. at 1488. The court found no duplication of effort and the number of hours petitioned for conservative. The court therefore approved as reasonable the attorneys' request for 6,036.8 hours.
 
 
 17
 The state argues that the district court's adoption of the exact number of hours claimed clearly shows that the court performed no independent analysis. Although the state does not dispute that the plaintiffs' attorneys actually worked over 6,000 hours, it asserts that the number of hours actually worked rarely equals the number of hours reasonably expended, citing Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 776 F.2d 646 (7th Cir.1985). For example, the state argues that the admittedly massive discovery was unreasonable in light of the medical panel's first report and the coinciding Estelle decision. For a more reasonable figure, the state asserts, the court should have looked to Palmigiano, 466 F.Supp. 732, and limited the number of hours to 1,220 as in that case.
 
 
 18
 Initially, we reject the state's assertion that the attorneys here should be paid for only 1,220 hours of their work simply because attorneys in Palmigiano, an unrelated prisoners' rights case, worked only 1,220 hours. To the contrary, the Supreme Court instructs that, "[t]he amount of the fee awarded turns on the facts of each case." Hensley, 461 U.S. at 429, 103 S.Ct. at 1937. See Hibma v. Odegaard, 769 F.2d 1147, 1157 (7th Cir.1985). While it is proper to consider the number of hours found reasonable in a similar but unrelated case, merely adopting that number as reasonable in a pending case would almost certainly constitute an abuse of discretion. That is of no concern here, however, since the court in its determination properly considered the "hours ordinarily necessary competently to prepare comparable cases," Bonner v. Coughlin, 657 F.2d 931, 934 (7th Cir.1981); Lightfoot II, 619 F.Supp. at 1487 (quoting Bonner ), in addition to relying upon its own observations of the attorneys in action, its own experience with complex civil rights litigation, the attorneys' testimony and work-product, and the testimony of the plaintiffs' expert in prisoners' civil rights litigation.
 
 
 19
 In Marek v. Chesney, the Supreme Court held that a prevailing plaintiff for purposes of Sec. 1988 is not entitled to any attorney's fees incurred after a valid Fed.R.Civ.P. 68 settlement offer has been made.[5] The district court construed the state's argument regarding the plaintiffs' refusal to settle as one under Marek, and found that, since no adequate Rule 68 offer had been made, Marek did not apply. The state asserts in this court that it never made a Rule 68 argument; that the district court misconstrued its argument below. Appellant's Reply Brief at 5. But see Argument of Patricia Chapin, Report of Proceedings at 39 (July 26, 1985) (Marek "is significant not only for the Rule 68 provisions upon which this defendant relies.... It specifically says if there is a settlement offer on the table as there was in this particular case, a Rule 68 offer, that affects the assessment of the results achieved."). Regardless, what the state's argument boils down to is that counsel should not be paid for the majority of the hours expended after the plaintiffs' allegedly unreasonable refusal to settle. The state asserts that the Supreme Court's decision in Estelle, combined with the first medical panel report, should have ended this litigation. We agree. That the litigation continued was not the fault of plaintiffs, however, for bringing the litigation to an end required the state to offer an adequate and comprehensive plan for remedying unconstitutional prison conditions overall. This was never done by the state. Instead, the district court, with the assistance of extensive post-trial briefs, tackled the job. Hence the district court properly rejected the state's argument that the plaintiffs' refusal to settle was unreasonable. To the contrary, the court found, and we agree, that the relief ultimately obtained was "far more favorable than any offer of settlement."[6] Lightfoot II, 619 F.Supp. at 1485.
 
 
 20
 Even if the plaintiffs' reasonably refused to settle, the state asserts, it was not reasonable for them to spend over 6,000 hours litigating this case. The state relies on Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., to support its argument that the number of hours actually worked does not generally equal the number reasonably expended. In Ohio-Sealy, we stated that "the court must disallow hours devoted to unrelated, unsuccessful claims[,] hours which the attorneys would not bill to their clients.... [and] hours for which the plaintiff provides inadequate documentation." 776 F.2d at 651.
 
 
 21
 The district court carefully reviewed the attorneys' time sheets and considered their testimony regarding the division of tasks. Grossman petitioned for 3,070.5 hours for the underlying litigation, while Flynn petitioned for 2,966.3. The court found these time expenditures well-documented and, where necessary, conservatively reconstructed.[7] At the fee hearing, Grossman testified that he had handled discovery for issues relating to psychiatric care, medical care, physician coverage, and intake screening, while Flynn's discovery work covered environmental health care and ancillary health personnel. He further testified that both attorneys did not attend every deposition and that they hired law students to do much of the non-lawyer work (for which they did not seek fees). In addition, Alvin Bronstein, a national expert in prison and civil rights litigation, testified on behalf of the plaintiffs that 6,036.8 hours was reasonable considering the difficulty in representing prisoners and the complexity of the issues in this type of case. Although the state tried to compare Lightfoot I with Palmigiano, Bronstein opined that the vast differences between the two cases made such a comparison impossible. Finally, when the state's own expert, John Bauman, testified as to the dollar value of Lightfoot I, he based his estimate upon the same number of hours claimed by counsel, albeit at lower than the requested hourly rates. After considering all of this evidence, as well as relying on its own observations of the litigation, the court found the number of hours claimed reasonable. Under the circumstances, we will not second-guess the court's judgment.
 
 
 22
 Nonetheless, the state asserts that no client would pay for the 829.50 hours counsel claim they spent in preparing the massive post-trial brief. It is true that at first glance the hours billed towards the post-trial brief appear lengthy. It is the district court which benefited from the preparation of this document, however, and we therefore defer to that court's judgment as to whether the time was well-spent. It was one thing to prove to the court that the prison's medical system was grossly deficient; it was quite another to guide the court in devising a plan for "totally revamp[ing that system] to such an extent that it now serves as a model for prison health care." Lightfoot II, 619 F.Supp. at 1489. Had the state been required to develop an adequate plan of its own for overhauling the entire system at Menard, it is not implausible to suggest that it would have cost the state at least as much as the plaintiffs' post-trial brief. We therefore cannot disagree with the district court that the hours spent preparing the brief were reasonable.
 
 
 23
 Finally, the state argues that counsels' vague description of time spent on the post-trial brief is insufficient to insure against double-billing. The district court found no duplication of effort, however, and we will not now penalize the attorneys simply because their later time-keeping may have lacked the extreme detail of their earlier records. As the Supreme Court has noted, an attorney "is not required to record in great detail how each minute of his time is expended[, as long as] ... counsel identif[ies] the general subject matter of his time expenditures." Hensley, 461 U.S. at 436-37 n. 12, 103 S.Ct. at 1941 n. 12. The attorneys have done so here. We agree with the district court that the attorneys' time has not been inappropriately allocated to one task over another. All work appears necessary and proper and is properly charged to the state under Sec. 1988.
 
 C. Use of Current Rates
 
 24
 The state also challenges the court's use of current rates. In Sec. 1988 cases, payment of attorney's fees is contingent upon success and is delayed until after the litigation has ended. In re Burlington Northern, Inc., 810 F.2d 601, 608 (7th Cir.1986). To compensate for the delay in payment and to simplify its calculation, courts often calculate fee awards using current market rates as opposed to historic rates. "The current market rates of the relevant legal community may approximate the value today of the historic rates charged at the time when the legal services actually were rendered." Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C.Cir.1984). This circuit has approved the use of current rates in similar, multiple-year litigation, see, e.g., In re Burlington Northern, Inc., 810 F.2d at 609; Gautreaux v. Chicago Housing Authority, 690 F.2d 601, 612 (7th Cir.1982); and Chrapliwy v. Uniroyal, Inc., 670 F.2d 760, 764 and n. 6 (7th Cir.1982), and, absent some compelling reason, we are unwilling to disturb the court's use of current rates here. See also Strama v. Peterson, 689 F.2d 661 (7th Cir.1982); Bonner v. Coughlin, 657 F.2d 931. Of course it is important in using current rates to avoid providing the attorneys with a windfall. See Ohio-Sealy, 776 F.2d at 662. Aware of this concern, the district court here determined that the use of current rates would compensate the attorneys for the delay in payment without creating a windfall. The court based this on its finding that the award at current rates was less than it would have been had the court utilized historic rates multiplied by the applicable interest rates. Lightfoot II, 619 F.Supp. at 1489.
 
 
 25
 The state argues, however, that a windfall results where as here the prevailing party is responsible for the delay in payment. While this may generally be true, we have already determined that the plaintiffs in this case were not responsible for protracting the litigation by refusing to settle. Moreover, even if the parties had settled, there is no guarantee that the settlement would have been expeditious. When "broad equitable relief is sought to remedy a constitutional violation," it is not unusual for the parties to "struggle, often for years, over the scope and details of injunctive relief." Gautreaux, 690 F.2d at 609-10.
 
 
 26
 Nor were the plaintiffs' attorneys dilatory in pursuing their fee petition as the state asserts. Shortly after the underlying litigation ended, but before the state had substantially complied with the court's remedial order, Grossman and Flynn began pursuing their Sec. 1988 claim. Unfortunately, as the district court noted, the fee issue erupted into a second major litigation. Our review of the record suggests that the state was at least equally responsible for the fact that five and one-half years elapsed between the issuance of the district court's underlying order and its fee orders.[8] The state wants to accept no responsibility for the delay, however, arguing that plaintiffs' counsel intentionally failed to press their claim until 1984, when the Supreme Court decided in Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) that nonprofit attorneys should be paid prevailing market rates under Sec. 1988. We disagree. Although the trial ended in late 1976, the court did not enter its order until 1980. For some time after that the plaintiffs' attorneys assisted in monitoring compliance with that order and, in October 1981, they filed their fee petition requesting a ruling without a hearing. Thereafter, the state requested a hearing and the state, after a hearing date was initially set for June 1984, requested a continuance. This, combined with the briefing schedule and the district court's own busy docket, pushed back the fee hearing until November 1984--about eight months after Blum was decided. The delay thus cannot reasonably be blamed on the plaintiffs' attorneys. Moreover, there was no reason to await the outcome of Blum since this circuit had previously approved the payment of market rates to nonprofit attorneys. See, e.g., Hairston v. R & R Apartments, 510 F.2d 1090 (7th Cir.1975); Brown v. Stanton, 617 F.2d 1224 (7th Cir.1980); Gautreaux, 690 F.2d 613. We therefore conclude that payment for all hours at current rates adequately compensated these nonprofit attorneys by mitigating the delay in payment.
 
 D. Reasonableness of Hourly Rates
 
 27
 Finally, the state challenges the hourly rates awarded to Flynn and Grossman.[9] In determining an hourly rate, the court's objective is "to find the rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " Blum, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. Both parties submitted evidence in an attempt to establish the prevailing rates. The plaintiffs' expert, Bronstein, testified that two attorneys in his office have experience in complex civil rights litigation comparable to that of Grossman and that Grossman could therefore command a similar rate of $125 per hour. He further opined that Flynn's efforts in this case were compensable at $95 to $100 per hour. In addition, Jerome Schlicter, a civil rights attorney in the Southern District of Illinois, testified on behalf of the plaintiffs that an attorney with Grossman's skill and experience would receive $125 per hour for his work in this case. John Bauman, an insurance defense attorney in the Southern District of Illinois, testified on behalf of the state that $75 per hour is the "going rate" in that locality. On cross-examination, however, he admitted that his associates sometimes bill as much as $100 per hour for non-specialized work and that he himself had never handled a civil rights case. In addition to the expert's testimony, the attorneys submitted affidavits setting forth hourly rates they had charged or had been awarded. After considering all of the evidence presented, the district court found reasonable both Grossman's rate of $115 per hour and Flynn's rate of $85 per hour.
 
 
 28
 Flynn's affidavits show that the top rate he had been paid in private practice was $70 per hour, yet Bronstein opined that Flynn could command a rate of $95 to $100 per hour for work in prisoners' civil rights litigation. The state argues that Flynn's top rate should serve as a rate ceiling and urges that Bronstein's testimony be disregarded since he is unfamiliar with rates paid attorneys practicing in the Southern District of Illinois. The plaintiffs' attorneys assert, on the other hand, that Flynn's $70 rate was for work in an area of law other than civil rights and performed in a locality other than the Southern District of Illinois and thus is not conclusive with respect to the rate Flynn should be paid for his work in this case. We agree that Flynn's $70 rate should not be used as a ceiling in these circumstances. As counsel argues, the $70 rate is not necessarily the prevailing rate since it was paid to Flynn for work outside of the market and outside of his specialty. The rate might serve as a starting point, however, enabling the district court to assess such variables as Flynn's experience and reputation. See, e.g., Chrapliwy, 670 F.2d at 769. It was also proper for the court to consider both Bronstein's testimony as to the national rate paid to civil rights attorneys with Flynn's experience and reputation handling a case such as this and Bauman's testimony as to the rate which Flynn might command for a similar case in the Southern District of Illinois. Finally, the court properly considered this evidence in light of its own knowledge of prevailing rates in the area. See Lynch v. City of Milwaukee, 747 F.2d 423, 428 (7th Cir.1984). Unfortunately, courts do not have the benefit of charts or grids into which all of the variables which go into determining a rate can be neatly fitted. A court is thus required to engage in a necessarily imprecise determination. Here the $85 per hour awarded for Flynn's work falls somewhere between the rates testified to by the experts. We agree with the district court that this is a reasonable rate and thus we will not disturb the court's judgment on appeal.
 
 
 29
 We similarly approve the court's award of $115 per hour for work done by Grossman. The court, which is in a better position than we to assess an attorney's skill and experience, recognized Grossman as superior in this type of complex litigation. Moreover, the rate awarded falls somewhere between the rates testified to by the parties' experts and is comparable to the rates Grossman has received under Sec. 1988 in other civil rights cases. The state asserts, however, that this rate is too high for the 198.3 hours Grossman claimed for his work in the fee litigation. The state argues that Grossman had no particular expertise in this area and that, since its own attorneys were paid only $85 per hour, that $85 per hour is the prevailing rate. We disagree. Grossman was, as the district court put it, "uniquely qualified to litigate the fee petition." Although Grossman had to merely review the massive underlying litigation, another attorney would have been required to completely familiarize himself with it in order to carry counsels' burden of showing that the number of hours claimed was reasonable. Grossman's intimate knowledge of this litigation no doubt saved numerous hours otherwise chargeable to the state. Moreover, Grossman has had experience in litigating fee petitions in other civil rights cases. We therefore find that the court's award of $115 per hour for all of the hours claimed by Grossman was not an abuse of discretion.
 
 E. Reasonableness of Fee Award
 
 30
 Having obtained a lodestar figure of $605,243.00 (3,070.5 hours X $115 per hour plus 2,966.3 hours X $85 per hour) for the underlying litigation, plus $60,120.50 (198.3 hours X $115 per hour plus 396.9 hours X $90 per hour plus 15.95 hours X $100 per hour) for the fee litigation, the district court declined counsels' request to add a positive multiplier of 25%. As explanation the court noted that the lodestar figure adequately compensated the attorneys for their work. The plaintiffs' attorneys have not appealed the district court's denial.
 
 
 31
 The results in this case were exceptional and counsel should therefore receive a fully compensatory fee. See Hensley, 461 U.S. at 434, 103 S.Ct. at 1940. As is always true in determining a fee award, however, "[t]he fuzziness of the criteria ... ensures that people seeking opportunities to contest the fees will not need to search hard." Kirchoff v. Flynn, 786 F.2d 320, 325 (7th Cir.1986). Although this case was no exception, we believe that the district court's thorough opinion has withstood all of the state's many challenges. Counsel have carried their burden of showing that the claimed rate and number of hours are reasonable and we may therefore presume that the resulting fee is reasonable. See In re Burlington Northern, Inc., 810 F.2d at 607 (quoting Blum, 465 U.S. at 897, 103 S.Ct. at 1548). In affirming the district court's fee award of $710,501.10, we also commend the plaintiffs' attorneys not only for their impressive and vigorous representation, but for the significant results obtained through that representation as well.
 
 III. BOND PENDING APPEAL
 
 32
 There is one more matter which we must address. The state requests that we reconsider our decision in Lightfoot III, 797 F.2d 505. After the district court entered judgment in favor of the plaintiffs in the amount of $710,501.10, the state applied to that court for an unsecured stay of execution pending its appeal in this court. The court denied the state's request, noting the uncertainty and delay counsel would face in collecting a judgment against the state.
 
 
 33
 The state then filed an emergency motion in this court, asking for an unsecured stay under Rule 8 of the Federal Rules of Appellate Procedure. The state argued that a bond was unnecessary given the state's solvency. Yet the state neglected to address the district court's concern regarding the uncertainty of payment or to provide any assurances that counsel would be able to expeditiously collect their judgment following the appeal. We therefore held that the district court had not abused its discretion in denying an unsecured stay and similarly denied the state's emergency application. Although the state requested that we make an independent judgment under Rule 8, as opposed to reviewing the court's order for an abuse of discretion, we declined to do so absent a change in circumstances occurring after the district court's denial.
 
 
 34
 The state subsequently petitioned for a rehearing of Lightfoot III, with the suggestion that it be en banc. In its petition, the state argues that the earlier panel misunderstood the certainty with which the state pays its judgments. The state asserts that if permitted to stand, our decision in Lightfoot III will have a profound impact on the state's financial resources. It is too late, however, for the state to argue for the first time in this case that its judgment creditors do not in fact face a cumbersome, time-consuming and uncertain method of collection. Since the state does not argue that there has been a change in the collection method subsequent to Lightfoot III, we will not make an independent determination under Rule 8. Lightfoot III is the law of this case, and we thus leave to the state the opportunity to argue in another case that the method it provides for collection of judgments is efficient and expeditious. The petition for rehearing is denied.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 The public officials who are the named defendants were sued in their official rather than personal capacities, so that the suit is in effect one against the state
 
 
 [2]
 In addition, the state does not challenge any part of the award relating to expenses
 
 
 [3]
 The state's attempt to supply an easy formula is confusing; it has neglected to indicate which of the 1,220 hours should be attributed to Grossman at $60 per hour and which to Flynn at $50 per hour
 
 
 [4]
 In finding that the plaintiffs prevailed, the district court noted that, "it would be difficult ... to think of a case where the plaintiffs have more completely prevailed." Lightfoot II, 619 F.Supp. at 1486. Nonetheless, the state surprisingly asserts that it prevailed to the extent that Menard remained open and that the relief ordered was no different than that which the state had been willing to negotiate for in settlement conferences. Appellant's Brief at 34. Considering the extensive relief ordered in this case, we do not consider this a serious challenge to the district court's finding
 
 
 [5]
 Rule 68 provides:
 At any time more than 10 days before the trial begins, a party defending against a claim may serve upon an adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued.... If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after making the offer.
 Fed.R.Civ.P. 68.
 
 
 [6]
 The state also argues, without further elaboration, that the failure to reach a settlement in this case was unreasonable since in an "identical case involving the Stateville penitentiary, the State entered into a consent decree and paid $77,210 in attorneys' fees to settle the entire Cook v. Rowe case." Appellant's Brief at 33. The Cook v. Rowe, No. 76 C 2224 (N.D.Ill.1977), consent decree was entered into after Lightfoot I was tried, however, and so arguably the state settled Cook in an attempt to avoid a repeat of Lightfoot I. Although the state is a defendant in both cases, it fails to shed any more light on the circumstances of settlement in Cook than to provide us with copies of the orders in that case. What is clear, however, is that the consent decree in Cook did not encompass the constitutional violations at Menard. Compare Spanish Action Committee of Chicago v. City of Chicago, 811 F.2d 1129 (7th Cir.1987)
 
 
 [7]
 When Lightfoot I was originally filed, Sec. 1988 had yet to be enacted. Public interest attorneys such as Grossman and Flynn therefore had previously had no reason to document their hours. Although contemporaneous time records are generally required, reconstruction of their hours was appropriate under the circumstances. See, e.g., Gautreaux v. Chicago Housing Authority, 690 F.2d 601, 612 (7th Cir.1982)
 
 
 [8]
 Interestingly, the state's attorneys billed over 1,220 hours during the fee litigation alone, the total number of hours the state now argues that counsel should recover for both the underlying litigation and the fee litigation combined. While we do not suggest that the hours billed by the losing party's attorneys should be compared to those of the prevailing attorneys in calculating a fee award, we do find the state's hours enlightening given its assertion that the plaintiffs alone were responsible for the long delay in payment
 
 
 [9]
 The state has not challenged the hourly rates awarded to the two additional attorneys, Richard Chase and Herbert Eastman, who litigated the fee issue on behalf of the plaintiffs